## AMERICAN AIRLINES, INC. *v.* WOLENS ET AL.

No. 93–1286.   Argued November 1, 1994—Decided January 18, 1995

220

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, SOUTER, and BREYER, JJ., joined, and in which STEVENS, J., joined as to Parts I (except for the last paragraph) and II–B. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 235. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which THOMAS, J., joined except for Part I–B, *post*, p. 238. SCALIA, J., took no part in the decision of the case.

*Bruce J. Ennis, Jr.*, argued the cause for petitioner. With him on the briefs were *Jerold S. Solovy, Marguerite M. Tompkins, Donald B. Verrilli, Jr., Richard A. Rothman, Bonnie Garone*, and *Michael J. Rider.*

*Gilbert W. Gordon* argued the cause for respondents. With him on the brief were *Robert Marks, Michael J. Freed, Michael B. Hyman, Nicholas E. Chimicles, Ira Neil Richards*, and *Steven A. Schwartz.*

*Cornelia T. L. Pillard* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Robert V. Zener, Jonathan R. Siegel*, and *Paul M. Geier.**

JUSTICE GINSBURG delivered the opinion of the Court.

The Airline Deregulation Act of 1978 prohibits States from "enact[ing] or enforc[ing] any law . . . relating to

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States of America by *Kenneth B. Alexander* and *Stephen A. Bokat;* for the Air Transport Association of America by *John G. Roberts, Jr., Walter A. Smith, Jr., Mary E. Downs, John R. Keys, Jr.*, and *Calvin P. Sawyier;* and for United Air Lines, Inc., by *Kenneth W. Starr, Paul T. Cappuccio*, and *J. Andrew Langan.*

[air carrier] rates, routes, or services." 49 U. S. C. App. § 1305(a)(1). This case concerns the scope of that preemptive provision, specifically, its application to a state-court suit, brought by participants in an airline's frequent flyer program, challenging the airline's retroactive changes in terms and conditions of the program. We hold that the ADA's preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves.

## I

## A

Until 1978, the Federal Aviation Act of 1958 (FAA), 72 Stat. 731, as amended, 49 U. S. C. App. § 1301 *et seq.* (1988 ed. and Supp. V), empowered the Civil Aeronautics Board (CAB) to regulate the interstate airline industry. Although the FAA, pre-1978, authorized the Board both to regulate fares and to take administrative action against deceptive trade practices, the federal legislation originally contained no clause preempting state regulation. And from the start, the FAA has contained a "saving clause," § 1106, 49 U. S. C. App. § 1506, stating: "Nothing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

In 1978, Congress enacted the Airline Deregulation Act (ADA), 92 Stat. 1705, which largely deregulated domestic air transport. "To ensure that the States would not undo federal deregulation with regulation of their own," *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 378 (1992), the ADA included a preemption clause which read in relevant part:

> "[N]o State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force

and effect of law relating to rates, routes, or services of any air carrier . . . ."   49 U. S. C. App. § 1305(a)(1).[1]

This case is our second encounter with the ADA's preemption clause.   In 1992, in *Morales,* we confronted detailed Travel Industry Enforcement Guidelines, composed by the National Association of Attorneys General (NAAG).   The NAAG guidelines purported to govern, *inter alia,* the content and format of airline fare advertising.   See *Morales,* 504 U. S., at 393–418 (appendix to Court's opinion setting out NAAG guidelines on air travel industry advertising and marketing practices).   Several States had endeavored to enforce the NAAG guidelines, under the States' general consumer protection laws, to stop allegedly deceptive airline advertisements.   The States' initiative, we determined, "'relat[ed] to [airline] rates, routes, or services,'" *id.,* at 378–379 (quoting 49 U. S. C. App. § 1305(a)(1)); consequently, we held, the fare advertising provisions of the NAAG guidelines were preempted by the ADA, *id.,* at 391.

For aid in construing the ADA words "relating to rates, routes, or services of any air carrier," the Court in *Morales* referred to the Employee Retirement Income Security Act of 1974 (ERISA), which provides for preemption of state laws "insofar as they . . . relate to any employee benefit plan." 29 U. S. C. § 1144(a).   Under the ERISA, we had ruled, a state law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan."   *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85, 97 (1983).   *Morales* analogously defined the "relating to" language in the ADA preemption clause as "having a connection with, or reference to, airline 'rates, routes, or services.'"   *Morales,* 504 U. S., at 384.

---

[1] Reenacting Title 49 of the U. S. Code in 1994, Congress revised this clause to read:

"[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ."   § 41713(b)(1).   Congress intended the revision to make no substantive change.   Pub. L. 103–272, § 1(a), 108 Stat. 745.

The *Morales* opinion presented much more, however, in accounting for the ADA's preemption of the state regulation in question. The opinion pointed out that the concerned federal agencies—the Department of Transportation (DOT)[2] and the Federal Trade Commission (FTC)—objected to the NAAG fare advertising guidelines as inconsistent with the ADA's deregulatory purpose; both agencies, *Morales* observed, regarded the guidelines as state regulatory measures preempted by the ADA. See *id.*, at 379 (DOT and FTC); *id.*, at 386 (DOT); *id.*, at 390 (FTC). *Morales* emphasized that the challenged guidelines set "binding requirements as to how airline tickets may be marketed," and "imposed [obligations that] would have a significant impact upon . . . the fares [airlines] charge." *Id.*, at 388, 390. The opinion further noted that the airlines would not have "*carte blanche* to lie and deceive consumers," for "the DOT retains the power to prohibit advertisements which in its opinion do not further competitive pricing." *Id.*, at 390–391. *Morales* also left room for state actions "too tenuous, remote, or peripheral . . . to have pre-emptive effect." *Id.*, at 390 (internal quotation marks omitted).

## B

The litigation now before us, two consolidated state-court class actions brought in Illinois, was *sub judice* when we decided *Morales*. Plaintiffs in both actions (respondents here) are participants in American Airlines' frequent flyer program, AAdvantage. AAdvantage enrollees earn mileage credits when they fly on American. They can exchange those credits for flight tickets or class-of-service upgrades. Plaintiffs complained that AAdvantage program modifications, instituted by American in 1988, devalued credits AAd-

---

[2] Deceptive trade practices regulatory authority formerly residing in the CAB was transferred to the DOT when the CAB was abolished in 1985. Civil Aeronautics Board Sunset Act of 1984, Pub. L. 98–443, § 3, 98 Stat. 1703; 49 U. S. C. App. § 1551.

vantage members had already earned. Plaintiffs featured American's imposition of capacity controls (limits on seats available to passengers obtaining tickets with AAdvantage credits) and blackout dates (restrictions on dates credits could be used). Conceding that American had reserved the right to change AAdvantage terms and conditions, plaintiffs challenged only the retroactive application of modifications, i. e., cutbacks on the utility of credits previously accumulated. These cutbacks, plaintiffs maintained, violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act), 815 Ill. Comp. Stat. §505 (1992) (formerly codified at Ill. Rev. Stat., ch. 121½, ¶261 et seq. (1991)), and constituted a breach of contract. Plaintiffs currently seek only monetary relief.[3]

In March 1992, several weeks before our decision in Morales, the Illinois Supreme Court rejected plaintiffs' prayer for an injunction. Such a decree, the Illinois court reasoned, would involve regulation of an airline's current rendition of services, a matter preempted by the ADA. That court, however, allowed the breach-of-contract and Consumer Fraud Act monetary relief claims to survive. The ADA's preemption clause, the Illinois court said, ruled out "only those State laws and regulations that specifically relate to and have more than a tangential connection with an airline's rates, routes or services." American Airlines, Inc. v. Wolens, 147 Ill. 2d 367, 373, 589 N. E. 2d 533, 536 (1992). After our decision in Morales, American petitioned for certiorari. The airline charged that the Illinois court, in a decision out of sync with Morales, had narrowly construed the ADA's broadly preemptive §1305(a)(1). We granted the petition,

---

[3] Plaintiffs no longer pursue requests they originally made for injunctive relief, or for punitive damages for alleged breach of contract. See Brief for Respondents 2, n. 2 (plaintiffs do not here contest holding of Illinois courts that injunctive relief is preempted); id., at 6, n. 9 (plaintiffs "concede that punitive damages traditionally have not been recoverable for a simple breach of contract").

vacated the judgment of the Supreme Court of Illinois, and remanded for further consideration in light of *Morales*. *American Airlines, Inc.* v. *Wolens*, 506 U. S. 803 (1992).

On remand, the Illinois Supreme Court, with one dissent, adhered to its prior judgment. Describing frequent flyer programs as not "essential," 157 Ill. 2d 466, 472, 626 N. E. 2d 205, 208 (1993), but merely "peripheral to the operation of an airline," *ibid.*, the Illinois court typed plaintiffs' state-law claims for money damages as "relat[ed] to American's rates, routes, and services" only "tangential[ly]" or "tenuous[ly]," *ibid.*

We granted American's second petition for certiorari, 511 U. S. 1017 (1994), and we now reverse the Illinois Supreme Court's judgment to the extent that it allowed survival of plaintiffs' Consumer Fraud Act claims; we affirm that judgment, however, to the extent that it permits plaintiffs' breach-of-contract action to proceed. In both respects, we adopt the position of the DOT, as advanced in this Court by the United States.

## II

We need not dwell on the question whether plaintiffs' complaints state claims "relating to [air carrier] rates, routes, or services." *Morales*, we are satisfied, does not countenance the Illinois Supreme Court's separation of matters "essential" from matters unessential to airline operations. Plaintiffs' claims relate to "rates," *i. e.*, American's charges in the form of mileage credits for free tickets and upgrades, and to "services," *i. e.*, access to flights and class-of-service upgrades unlimited by retrospectively applied capacity controls and blackout dates. But the ADA's preemption clause contains other words in need of interpretation, specifically, the words "enact or enforce any law" in the instruction: "[N]o State . . . shall enact or enforce any law . . . relating to [air carrier] rates, routes, or services." 49 U. S. C. App. § 1305(a)(1). Taking into account all the words Congress placed in § 1305(a)(1), we first consider whether plaintiffs'

claims under the Consumer Fraud Act are preempted, and then turn to plaintiffs' breach-of-contract claims.

## A

The Consumer Fraud Act declares unlawful

> "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." Ill. Comp. Stat., ch. 815, § 505/2 (1992) (formerly codified at Ill. Rev. Stat., ch. 121½, ¶ 262 (1991)).

The Act is prescriptive; it controls the primary conduct of those falling within its governance. This Illinois law, in fact, is paradigmatic of the consumer protection legislation underpinning the NAAG guidelines. The NAAG Task Force on the Air Travel Industry, on which the Attorneys General of California, Illinois, Texas, and Washington served, see *Morales*, 504 U. S., at 392, reported that the guidelines created no

> "new laws or regulations regarding the advertising practices or other business practices of the airline industry. They merely explain in detail how existing state laws apply to air fare advertising and frequent flyer programs." *Ibid.*

The NAAG guidelines highlight the potential for intrusive regulation of airline business practices inherent in state consumer protection legislation typified by the Con-

sumer Fraud Act. For example, the guidelines enforcing the legislation instruct airlines on language appropriate to reserve rights to alter frequent flyer programs, and they include transition rules for the fair institution of capacity controls. See Brief for United States as *Amicus Curiae* 13–14, n. 7.

As the NAAG guidelines illustrate, the Consumer Fraud Act serves as a means to guide and police the marketing practices of the airlines; the Act does not simply give effect to bargains offered by the airlines and accepted by. airline customers. In light of the full text of the preemption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services,[4] we conclude that § 1305(a)(1) preempts plaintiffs' claims under the Consumer Fraud Act.

## B

American maintains, and we agree, that "Congress could hardly have intended to allow the States to hobble [competition for airline passengers] through the application of restrictive state laws." Brief for Petitioner 27. We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations

---

[4] We note again, however, that the DOT retains authority to investigate unfair and deceptive practices and unfair methods of competition by airlines, and may order an airline to cease and desist from such practices or methods of competition. See FAA §411, 49 U. S. C. App. §1381(a); *Morales,* 504 U. S., at 379; see also Brief for United States as *Amicus Curiae* 3, and n. 2 (reporting that in 1993, the DOT issued 34 cease-and-desist orders and assessed more than $1.8 million in civil penalties in aviation economic enforcement proceedings).

"and thus do not amount to a State's 'enact[ment] or enforce-
[ment] [of] any law, rule, regulation, standard, or other provi-
sion having the force and effect of law' within the meaning
of [§ ]1305(a)(1)."[5]   Brief for United States as *Amicus Cu-
riae* 9.   Cf. *Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504,
526 (1992) (plurality opinion) ("[A] common-law remedy for a
contractual commitment voluntarily undertaken should not
be regarded as a 'requirement . . . *imposed under State law*'
within the meaning of [Federal Cigarette Labeling and Ad-
vertising Act] § 5(b)."). A remedy confined to a contract's
terms simply holds parties to their agreements—in this in-
stance, to business judgments an airline made public about
its rates and services.[6]

---

[5] The United States recognizes that § 1305(a)(1), because it contains the
word "enforce" as well as "enact," "could perhaps be read to preempt even
state-court enforcement of private contracts." Brief for United States as
*Amicus Curiae* 17.   But the word series "law, rule, regulation, standard,
or other provision," as the United States suggests, "connotes official,
government-imposed policies, not the terms of a private contract." *Id.,*
at 16.   Similarly, the phrase "having the force and effect of law" is most
naturally read to "refe[r] to binding standards of conduct that operate
irrespective of any private agreement." *Ibid.*   Finally, the ban on enact-
ing or enforcing any law "relating to rates, routes, or services" is most
sensibly read, in light of the ADA's overarching deregulatory purpose, to
mean "States may not seek to impose their own public policies or theories
of competition or regulation on the operations of an air carrier." *Ibid.*

[6] American notes that in *Norfolk & Western R. Co.* v. *Train Dispatchers,*
499 U. S. 117, 129 (1991), the Court read the word "law" in a statutory
exemption, 49 U. S. C. § 11341(a), to include "laws that govern the obliga-
tions imposed by contract." But that statute and case are not comparable
to the statute and case before us. *Norfolk & Western* concerned the au-
thority of the Interstate Commerce Commission (ICC) to approve rail car-
rier consolidations.   A carrier participating in an ICC-approved consolida-
tion is exempt "from the antitrust laws and from all other law . . . as
necessary to let [the participant] carry out the transaction." 49 U. S. C.
§ 11341(a).   We read the exemption clause to empower the ICC to over-
ride, individually, a carrier's obligations under a collective-bargaining
agreement.   Our reading accorded with the ICC's and "ma[de] sense of
the consolidation provisions," 499 U. S., at 132: "If § 11341(a) did not apply

The ADA, as we recognized in *Morales*, 504 U. S., at 378, was designed to promote "maximum reliance on competitive market forces." 49 U. S. C. App. § 1302(a)(4). Market efficiency requires effective means to enforce private agreements. See Farber, Contract Law and Modern Economic Theory, 78 Nw. U. L. Rev. 303, 315 (1983) (remedy for breach of contract "is necessary in order to ensure economic efficiency"); R. Posner, Economic Analysis of Law 90–91 (4th ed. 1992) (legal enforcement of contracts is more efficient than a purely voluntary system). As stated by the United States: "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on needs perceived by the contracting parties at the time." Brief for United States as *Amicus Curiae* 23. That reality is key to sensible construction of the ADA.

The FAA's text, we note, presupposes the vitality of contracts governing transportation by air carriers. Section 411(b), 49 U. S. C. App. § 1381(b), thus authorizes airlines to "incorporate by reference in any ticket or other written instrument any of the terms of the contract of carriage" to the extent authorized by the DOT. And the DOT's regulations contemplate that, upon the January 1, 1983, termination of domestic tariffs, "ticket contracts" ordinarily would be enforceable under "the contract law of the States." 47 Fed. Reg. 52129 (1982). Correspondingly, the DOT requires carriers to give passengers written notice of the time period within which they may "bring an action against the carrier for its acts." 14 CFR § 253.5(b)(2) (1994).

American does not suggest that its contracts lack legal force. American sees the DOT, however, as the exclusively competent monitor of the airline's undertakings. American

---

to bargaining agreements . . . , rail carrier consolidations would be difficult, if not impossible, to achieve," *id.*, at 133. Similarly in this case, our reading of the statutory formulation accords with that of the superintending agency, here, the DOT, and is necessary to make sense of the statute as a whole.

points to the Department's authority to require any airline, in conjunction with its certification, to file a performance bond conditioned on the airline's "making appropriate compensation . . . , as prescribed by the [Department], for failure . . . to perform air transportation services in accordance with agreements therefor." FAA § 401(q)(2), 49 U. S. C. App. § 1371(q)(2).[7] But neither the DOT nor its predecessor, the CAB, has ever construed or applied this provision to displace courts as adjudicators in air carrier contract disputes. Instead, these agencies have read the provision to charge them with a less taxing task: In passing on air carrier fitness under FAA § 401(d), 49 U. S. C. App. § 1371(d)(1), the DOT and the CAB have used their performance bond authority to ensure that, when a carrier's financial fitness is marginal, funds will be available to compensate customers if the carrier goes under before providing already-paid-for services. See, e. g., *U. S. Bahamas Service Investigation*, CAB Order 79–11–116, p. 3, 84 CAB Reports 73, 75 (1979) ("We . . . find that Southeast [Airlines] is fit to provide scheduled foreign air transportation. However, because of Southeast's current financial condition its operations present an unacceptable risk of financial loss to consumers. Therefore, we shall require the carrier . . . to procure and maintain a bond for the protection of passengers who have paid for transportation not yet performed.").

---

[7] The preceding subsection, FAA § 401(q)(1), 49 U. S. C. App. § 1371(q)(1), requires an air carrier to have insurance, in an amount prescribed by the DOT, to cover claims for personal injuries and property losses "resulting from the operation or maintenance of aircraft." See Brief for United States as *Amicus Curiae* 19–20, and n. 12. American does not urge that the ADA preempts personal injury claims relating to airline operations. See Tr. of Oral Arg. 4 (acknowledgment by counsel for petitioner that "safety claims," for example, a negligence claim arising out of a plane crash, "would generally not be preempted"); Brief for United States as *Amicus Curiae* 20, n. 12 ("It is . . . unlikely that Section 1305(a) (1) preempts safety-related personal-injury claims relating to airline operations.").

The United States maintains that the DOT has neither the authority nor the apparatus required to superintend a contract dispute resolution regime. See Brief for United States as *Amicus Curiae* 22. Prior to airline deregulation, the CAB set rates, routes, and services through a cumbersome administrative process of applications and approvals. 72 Stat. 731. When Congress dismantled that regime, the United States emphasizes, the lawmakers indicated no intention to establish, simultaneously, a new administrative process for DOT adjudication of private contract disputes. See Brief for United States as *Amicus Curiae* 22. We agree.

Nor is it plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services. The ADA contains no hint of such a role for the federal courts. In this regard, the ADA contrasts markedly with the ERISA, which does channel civil actions into federal courts, see ERISA §§ 502(a), (e), 29 U. S. C. §§ 1132(a), (e), under a comprehensive scheme, detailed in the legislation, designed to promote "prompt and fair claims settlement." *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 54 (1987); see *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 143–145 (1990) (finding ERISA's comprehensive civil enforcement scheme a "special feature" supporting preemption of common-law wrongful discharge claims).

The conclusion that the ADA permits state-law-based court adjudication of routine breach-of-contract claims also makes sense of Congress' retention of the FAA's saving clause, § 1106, 49 U. S. C. App. § 1506 (preserving "the remedies now existing at common law or by statute"). The ADA's preemption clause, § 1305(a)(1), read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself

stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.[8]

American suggests that plaintiffs' breach-of-contract and Consumer Fraud Act claims differ only in their labels, so that if Fraud Act claims are preempted, contract claims must be preempted as well. See Reply Brief 6. But a breach of contract, without more, "does not amount to a cause of action cognizable under the [Consumer Fraud] Act and the Act should not apply to simple breach of contract claims." *Golembiewski* v. *Hallberg Ins. Agency, Inc.*, 262 Ill. App. 3d 1082, 1093, 635 N. E. 2d 452, 460 (1st Dist. 1994). The basis for a contract action is the parties' agreement; to succeed under the consumer protection law, one must show not necessarily an agreement, but in all cases, an unfair or deceptive practice.

## III

American ultimately argues that even under the position on preemption advanced by the United States—the one we adopt—plaintiffs' claims must fail because they "inescapably depend on state policies that are independent of the intent of the parties." Reply Brief 3. "The state court cannot reach the merits," American contends, "unless it first invalidates or limits [American's] express reservation of the right

---

[8] The United States notes in this regard that "[s]ome state-law principles of contract law . . . might well be preempted to the extent they seek to effectuate the State's public policies, rather than the intent of the parties." Brief for United States as *Amicus Curiae* 28. Because contract law is not at its core "diverse, nonuniform, and confusing," *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 529 (1992) (plurality opinion), we see no large risk of nonuniform adjudication inherent in "[s]tate-court enforcement of the terms of a uniform agreement prepared by an airline and entered into with its passengers nationwide." Brief for United States as *Amicus Curiae* 27.

to change AAdvantage Program rules contained in AAdvantage contracts." *Ibid.*

American's argument is unpersuasive, for it assumes the answer to the very contract construction issue on which plaintiffs' claims turn: Did American, by contract, reserve the right to change the value of already accumulated mileage credits, or only to change the rules governing credits earned from and after the date of the change? See Brief for Respondents 5 (plaintiffs recognize that American "reserved the right to restrict, suspend, or otherwise alter aspects of the Program prospectively," but maintain that American "never reserved the right to retroactively diminish the value of the credits previously earned by members"). That question of contract interpretation has not yet had a full airing, and we intimate no view on its resolution.

Responding to our colleagues' diverse opinions dissenting in part, we add a final note. This case presents two issues that run all through the law. First, who decides (here, courts or the DOT, the latter lacking contract dispute resolution resources for the task)? On this question, all agree to this extent: None of the opinions in this case would foist on the DOT work Congress has neither instructed nor funded the Department to do. Second, where is it proper to draw the line (here, between what the ADA preempts, and what it leaves to private ordering, backed by judicial enforcement)? JUSTICE STEVENS reads our *Morales* decision to demand only minimal preemption; in contrast, JUSTICE O'CONNOR reads the same case to mandate total preemption.[9] The middle course we adopt seems to us best calculated to carry out the congressional design; it also bears the approval of the statute's experienced administrator, the DOT. And while we adhere to our holding in *Morales*, we do not overlook that in our system of adjudication, principles seldom can

---

[9] JUSTICE O'CONNOR's "all is pre-empted" position leaves room for personal injury claims, but only by classifying them as matters not "relating to [air carrier] services." See *post*, at 242–243.

be settled "on the basis of one or two cases, but require a closer working out." Pound, Survey of the Conference Problems, 14 U. Cin. L. Rev. 324, 339 (1940) (Conference on the Status of the Rule of Judicial Precedent).

\* \* \*

For the reasons stated, the judgment of the Illinois Supreme Court is affirmed in part and reversed in part, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA took no part in the decision of the case.

JUSTICE STEVENS, concurring in part and dissenting in part.

Although I agree with the majority that the Airline Deregulation Act of 1978 (ADA) does not pre-empt respondents' breach-of-contract claims, I do not agree with the Court's disposition of their consumer-fraud claims. In my opinion, private tort actions based on common-law negligence or fraud, or on a statutory prohibition against fraud, are not pre-empted. Under the broad (and in my opinion incorrect[1]) interpretation of the words "law . . . relating to rates, routes, or services" that the Court adopted in *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374 (1992), direct state regulation of airline advertising is pre-empted; but I would not extend the holding of that case to embrace the private claims that respondents assert in this case.

Unlike the National Association of Attorneys General (NAAG) guidelines reviewed in *Morales,* the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) does not instruct the airlines about how they can market their services. Instead, it merely requires

---

[1] See *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 419–427 (1992) (dissenting opinion).

all commercial enterprises—airlines included—to refrain from defrauding their customers. The *Morales* opinion said nothing about pre-empting general state laws prohibiting fraud. The majority's extension of the ADA's pre-emptive reach from airline-specific advertising standards to a general background rule of private conduct represents an alarming enlargement of *Morales'* holding.

I see no reason why a state law requiring an airline to honor its contractual commitments is any less a law relating to its rates and services than is a state law imposing a "duty not to make false statements of material fact or to conceal such facts." *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 528 (1992) (finding similar claim not to be pre-empted under Federal Cigarette Labeling and Advertising Act). In this case, the two claims are grounded upon the exact same conduct and would presumably have an identical impact upon American's rates, routes, and services. The majority correctly finds that Congress did not intend to pre-empt a claim that an airline breached a private agreement. I see no reason why the ADA should pre-empt a claim that the airline defrauded its customers in the making and performance of that very same agreement.

I would analogize the Consumer Fraud Act to a codification of common-law negligence rules. Under ordinary tort principles, every person has a duty to exercise reasonable care toward all other persons with whom he comes into contact. Presumably, if an airline were negligent in a way that somehow affected its rates, routes, or services,[2] and the victim of the airline's negligence were to sue in state court, the majority would not hold all common-law negligence rules to be pre-empted by the ADA. See *ante*, at 231, n. 7. Like contract principles, the standard of ordinary care is a general

---

[2] Indeed, every judgment against an airline will have some effect on rates, routes, or services, at least at the margin. In response to adverse judgments, airlines may have to raise rates, or curtail routes or services, to make up for lost income.

background rule against which all individuals order their affairs. Surely Congress did not intend to give airlines free rein to commit negligent acts subject only to the supervision of the Department of Transportation, any more than it meant to allow airlines to breach contracts with impunity. See *ante,* at 230–233. And, if judge-made duties are not preempted, it would make little sense to find pre-emption of identical rules codified by the state legislature. The duty imposed by the Consumer Fraud Act is to refrain from committing fraud in commercial dealings—it is "the duty not to deceive." *Cipollone,* 505 U. S., at 529. This is neither a novel nor a controversial proscription. It falls no more heavily upon airlines than upon any other business. It is no more or less a state-imposed "public policy" than a negligence rule. In sum, I see no difference between the duty to refrain from deception and the duty of reasonable care, and I see no meaningful difference between the enforcement of either duty and the enforcement of a private agreement.

The majority's extension of *Morales* is particularly untenable in light of the interpretive presumption against preemption. As in *Cipollone,* I believe there is insufficient evidence of congressional intent to supersede laws of general applicability to justify a finding that the ADA pre-empts either the contract or the fraud claim. *Cipollone,* 505 U. S., at 525–530; see also *Morales,* 504 U. S., at 419–421 (STEVENS, J., dissenting) (discussing presumption against pre-emption as an incident of federalism). Indeed, the presumption against pre-emption is especially appropriate to the ADA because Congress retained the "saving clause" preserving state "remedies now existing at common law or by statute." 49 U. S. C. App. § 1506.

Accordingly, while I join the Court's disposition of the breach-of-contract claims,[3] I would affirm the entire judgment of the Supreme Court of Illinois.

---

[3] Accordingly, I join Part I, except for the last paragraph, and Part II–B of the Court's opinion.

JUSTICE O'CONNOR, with whom JUSTICE THOMAS joins as to all but Part I–B, concurring in the judgment in part and dissenting in part.

In permitting respondents' contract action to go forward, the Court arrives at what might be a reasonable policy judgment as to when state law actions against airlines should be pre-empted if we were free to legislate it. It is not, however, consistent with our controlling precedents, and it requires some questionable assumptions about the nature of contract law. I would hold that none of respondents' actions may proceed.

I

A

The Airline Deregulation Act of 1978 (ADA) says that "no State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." 49 U. S. C. App. § 1305(a)(1).[1] We considered the scope of that provision in *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374 (1992). We noted the similarity of § 1305's language to the pre-emption provision in ERISA, 29 U. S. C. § 1144(a), and said that, like ERISA's § 1144, § 1305's words "express a broad pre-emptive purpose." 504 U. S., at 383. We concluded that "State enforcement actions having a connection with, or reference to, airline 'rates, routes, or services' are pre-empted." *Id.,* at 384.

Applying *Morales* to this case, I agree with the Court that respondents' consumer fraud and contract claims are "related to" airline "rates" and "services." See *ante,* at 226. The Court says, however, that judicial enforcement of a contract's

---

[1] Congress has recently amended this statute to read: "[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U. S. C. § 41713(b)(1) (1994 ed.). Congress intended this amendment to be "without substantive change." See Pub. L. 103–272, § 1(a), 108 Stat. 745.

terms, in accordance with state contract law, does not amount to a "State . . . enforc[ing] any law," §1305, but instead is simply a State "hold[ing] parties to their agreemen[t]." See *ante,* at 229, and n. 5. It therefore concludes that §1305 does not apply to respondents' contract actions. I cannot agree with that conclusion.

I do not understand the Court to say that a State only "enforces" its "law" when some state employee (*e. g.,* an attorney general, or a judge) orders someone to do something. If that were the meaning of "enforce" in this context, then a diversity action brought by a private party under state law in federal court would never be subject to §1305 pre-emption, because no state employee is involved, whereas the same action might be pre-empted in state court. That would make little sense, and federal courts have routinely considered §1305 in determining whether a particular state law claim is pre-empted. *E. g., Statland* v. *American Airlines, Inc.,* 998 F. 2d 539, 541–542 (CA7) (contract claim pre-empted), cert. denied, 510 U. S. 1012 (1993); *West* v. *Northwest Airlines, Inc.,* 995 F. 2d 148, 151 (CA9 1993) (tort claim for punitive damages pre-empted), cert. denied, 510 U. S. 1111 (1994); *Cannava* v. *USAir, Inc.,* No. 91–30003–F, 1993 WL 565341, *6 (D. Mass., Jan. 7, 1993) (tort and contract claims pre-empted). Consequently, one must read "no State . . . shall . . . enforce any law" to mean that *no one* may enforce state law against an airline when the "enforcement actio[n] ha[s] a connection with, or reference to, airline 'rates, routes, or services.'" *Morales, supra,* at 384. This explains the Court's conclusion, with which I agree, that private parties such as respondents may not enforce the Illinois consumer fraud law against petitioner in an action whose subject matter relates to airline rates and services. *Ante,* at 228.

As I read §1305 and *Morales,* however, respondents' contract claims also must be pre-empted. The Court recognizes, *ante,* at 227, that the "guidelines" at issue in *Morales*

did not "'create any new laws or regulations' applying to the airline industry; rather, they claim[ed] to 'explain in detail how existing state laws apply to air fare advertising and frequent flyer programs.'" *Morales*, 504 U. S., at 379. Nonetheless, we stated our holding quite clearly: "We hold that the fare advertising provisions of the NAAG guidelines are pre-empted by [§ 1305]." *Id.*, at 391. How can it be that the guidelines, which did not themselves constitute "law," were nonetheless pre-empted by a statute whose coverage is limited to "laws" or other "provision[s] having the force and effect of law"? The answer is that in *Morales* we held that an action to invoke the State's coercive power against an airline, by means of a generally applicable law, when the subject matter of the action related to airline rates, would constitute "Stat[e] . . . enforce[ment]" of a "law . . . relating to rates, routes, or services." *Id.*, at 383 (internal quotation marks omitted). Accordingly, we held that § 1305 pre-empted the action. It is not the case, as JUSTICE STEVENS urges, that *Morales* was limited to "airline-specific advertising standards." *Ante*, at 236. We examined the content of those standards—which had no binding force on their own— only to ascertain whether they "related to" airline rates (and we thought they "quite obviously" did). *Morales, supra*, at 387. The only "laws" at issue in *Morales* were generally applicable consumer fraud statutes, not facially related to airlines, much like the law at issue in respondents' consumer fraud claims here.

The Court concludes, however, that § 1305 does *not* preempt enforcement, by means of generally applicable state law, of a private agreement relating to airline rates and services. I cannot distinguish this case from *Morales*. In both, the subject matter of the action (the guidelines in *Morales*, the contract here) relates to airline rates and services. In both, that subject matter has no legal force, except insofar as a generally applicable state law (a consumer fraud law in

*Morales*, state contract law here[2]) permits an aggrieved party to invoke the State's coercive power against someone refusing to comply with the subject matter's terms (the requirements of the guidelines in *Morales*, the terms of the contract here). *Morales'* conclusion that § 1305 pre-empts such an invocation is dispositive here, both of respondents' consumer fraud claims, and of their contract claims. The lower courts seem to agree; as far as I know, no court to have considered ADA pre-emption since we decided *Morales* has suggested that enforcement of state contract law does not fall within § 1305 if the necessary relation to airline rates, routes, or services exists. See, *e. g., Statland* v. *American Airlines, supra,* at 541–542 (contract claims pre-empted); *West* v. *Northwest Airlines, supra,* at 151–152 (contract claims not pre-empted because "too tenuously connected" to airline rates or services); *Cannava* v. *USAir, Inc., supra,* at *6 (contract claims pre-empted); *Schaefer* v. *Delta Airlines,* No. 92–1170–E(LSP), 1992 WL 558954, *2 (SD Cal., Sept. 18, 1992) (same); *Vail* v. *Pan Am Corp.,* 260 N. J. Super. 292, 299–300, 616 A. 2d 523, 526–527 (App. Div. 1992) (same); *El-Menshawy* v. *Egypt Air,* 276 N. J. Super. 121, 126, 647 A. 2d 491, 493 (Law Div. 1994) (same).

The Court argues that the words "law, rule, regulation, standard, or other provision" in § 1305 refer only to "'official, government-imposed policies, not the terms of a private contract.'" *Ante,* at 229, n. 5 (quoting Brief for United States as *Amicus Curiae* 17). To be sure, the terms of private contracts are not "laws," any more than the guidelines at issue in *Morales* were "laws." But contract law, and generally applicable consumer fraud statutes, *are* laws, and *Morales* held that § 1305 prevents enforcement of "any [state] law" against the airlines when the subject matter of the action

---

[2] See *Norfolk & Western R. Co.* v. *Train Dispatchers,* 499 U. S. 117, 130 (1991) ("A contract has no legal force apart from the law that acknowledges its binding character"), discussed *infra,* at 243–244.

"relates" to airline rates, routes, or services. Thus, where the terms of a private contract relate to airline rates and services, and those terms can only be enforced *through state law*, *Morales* is indistinguishable. As JUSTICE STEVENS persuasively argues, there is "no reason why a state law requiring an airline to honor its contractual commitments is any less a law relating to its rates and services than is a state law imposing a 'duty not to make false statements of material fact or to conceal such facts,'" *ante*, at 236.

As the Court recognizes, *ante*, at 234, n. 9, my view of *Morales* does not mean that personal injury claims against airlines are always pre-empted. Many cases decided since *Morales* have allowed personal injury claims to proceed, even though none has said that a State is not "enforcing" its "law" when it imposes tort liability on an airline. In those cases, courts have found the particular tort claims at issue not to "relate" to airline "services," much as we suggested in *Morales* that state laws against gambling and prostitution would be too tenuously related to airline services to be pre-empted, see *Morales, supra*, at 390. *E. g., Hodges* v. *Delta Airlines, Inc.*, 4 F. 3d 350, 353–356 (CA5 1993) (arguing that "'services' is not coextensive with airline 'safety,'" so safety-related tort claim should not be pre-empted; urging en banc review to bring Circuit precedent into conformity with that view), rehearing en banc granted, 12 F. 3d 426 (1994); *Public Health Trust* v. *Lake Aircraft, Inc.*, 992 F. 2d 291, 294–295 (CA11 1993) (tort claim for defective aircraft design not pre-empted because not related to airline services); *Cleveland* v. *Piper Aircraft Corp.*, 985 F. 2d 1438, 1443, and n. 11, 1444, n. 13 (CA10) (same), cert. denied, 510 U. S. 908 (1993); *Stagl* v. *Delta Air Lines, Inc.*, 849 F. Supp. 179, 182 (EDNY 1994) (tort claim against airline for personal injury not pre-empted because not related to airline "services" within the meaning of § 1305); *Curley* v. *American Airlines, Inc.*, 846 F. Supp. 280, 284 (SDNY 1994) (same); *Bayne* v. *Adventure Tours USA, Inc.*, 841 F. Supp. 206 (ND Tex. 1994)

(same); *Fenn* v. *American Airlines, Inc.*, 839 F. Supp. 1218, 1222–1223 (SD Miss. 1993) (same); *Chouest* v. *American Airlines, Inc.*, 839 F. Supp. 412, 416–417 (ED La. 1993) (same); *O'Hern* v. *Delta Airlines, Inc.*, 838 F. Supp. 1264, 1267 (ND Ill. 1993) (same); *In re Air Disaster*, 819 F. Supp. 1352, 1363 (ED Mich. 1993) (same); *Butcher* v. *Houston*, 813 F. Supp. 515, 518 (SD Tex. 1993) (same).

Our recent decision in *Norfolk & Western R. Co.* v. *Train Dispatchers*, 499 U. S. 117 (1991), is relevant. The question in that case was whether a rail carrier's statutory exemption from "all other law," which we read to mean "*all law* as necessary to carry out an ICC-approved transaction," *id.*, at 129, exempted the carrier from contractually imposed obligations. We held that it did. We noted that "[a] contract depends on a regime of common and statutory law for its effectiveness and enforcement," *id.*, at 129–130, that "[a] contract has no legal force apart from the law that acknowledges its binding character," *id.*, at 130, and that "'[l]aws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms," *ibid.* (quoting *Farmers and Merchants Bank of Monroe* v. *Federal Reserve Bank of Richmond*, 262 U. S. 649, 660 (1923)). Accordingly, we concluded that "the exemption . . . from 'all other law' effects an override of contractual obligations . . . by suspending application of the law that makes the contract binding." 499 U. S., at 130. In so concluding, we specifically rejected the Court of Appeals' views that the "all other law" exemption "[n]owhere . . . sa[id] that the ICC may also override contracts," and that it did not exempt the carrier from "'all legal obstacles.'" *Brotherhood of R. Carmen* v. *ICC*, 880 F. 2d 562, 567 (CADC 1989); see *Norfolk & Western, supra*, at 133–134.

The Court does not dispute this reading of *Norfolk & Western*, which in my view makes clear that a State is enforcing its "law" when it brings its coercive power to bear

on a party who has violated a contractual obligation. We reiterated in *Norfolk & Western* that "[t]he obligation of a contract is the law which binds the parties to perform their agreement." 499 U. S., at 129 (internal quotation marks omitted); see also *Sturges* v. *Crowninshield*, 4 Wheat. 122, 197 (1819) (Marshall, C. J.) ("A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract"). We therefore read the words "all other law" in the statutory exemption broadly enough to "suspen[d] application of the law that makes the contract binding." *Norfolk & Western, supra*, at 130. I would give the words "any law" in § 1305 a similar reading.

As support for its theory, the Court cites only a statement in the plurality opinion in *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504 (1992); see *ante*, at 229. The *Cipollone* plurality said that "a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement . . . *imposed under State law*' within the meaning of § 5(b)." 505 U. S., at 526. But the plurality elaborated on this point in a footnote. In rejecting the argument that specific warranty obligations are "imposed under State law," the plurality agreed that pre-emption might be required "if the Act pre-empted '*liability*' imposed under state law . . . ; but instead the Act expressly pre-empts only a '*requirement or prohibition*' imposed under state law." *Id.*, at 526, n. 24. It agreed that contractual requirements are "only enforceable under state law," but argued that those requirements are "'imposed' by the contracting party upon itself." *Ibid.* The plurality thus distinguished the situation where substantive requirements contained in a contract are enforceable only under state law from the situation where state law *itself* imposes substantive requirements, and concluded that the statute before it pre-empted only the latter kind of state law. Here, as in *Cipollone*, the requirements

at issue are contained in a contract, and have no legal force except insofar as state law makes them enforceable. But we concluded in *Morales* that § 1305 *does* pre-empt state law in those circumstances, unlike the statute in *Cipollone.* The difference between this case and *Cipollone* is the very different language in the two pre-emption statutes.

The Court also concludes that § 1305 only "stops States from imposing their own substantive standards with respect to rates, routes, or services," *ante,* at 232. In *Morales,* however, we specifically rejected an interpretation of § 1305 that would have rewritten it to read: No State shall " '*regulate* rates, routes, and services.' " See *Morales,* 504 U. S., at 385–386. There is little distinction between "regulating rates, routes, and services" and "imposing substantive standards with respect to rates, routes, and services," and the Court does not explain how *Morales'* rejection of the former allows it now to adopt the latter. The Court relies on the statute's "saving clause," 49 U. S. C. App. § 1506, see *ante,* at 232, but we said in *Morales* that "[a] general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision," particularly where, as here, "the 'saving' clause is a relic of the pre-ADA/no pre-emption regime." *Morales,* 504 U. S., at 385.

Without question, *Morales* gave § 1305 a broad pre-emptive sweep. The dissent in that case argued that such a broad interpretation went too far by pre-empting areas of traditional state regulation without a clear expression of congressional intent to do so. *Id.,* at 421–424 (STEVENS, J., dissenting); see also *ante,* at 235, 237 (STEVENS, J., concurring in part and dissenting in part). But the Court rejected the dissent's reading, holding instead that § 1305's language demonstrated a clear "statutory intent" to expressly pre-empt generally applicable state law as long as the "particularized application" of that law relates to airline rates, routes, or services. *Morales, supra,* at 383, 386, and n. 2.

## B

Congress has recently revisited § 1305, and said that it "d[id] not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in *Morales*," H. R. Conf. Rep. No. 103–677, p. 83 (1994). If the Court nonetheless believes that *Morales* misread § 1305, the proper course of action would be to overrule that case, despite Congress' apparent approval of it. The Court's reading of § 1305 is not, in my view, a "'closer working out'" of ADA pre-emption, see *ante*, at 235; rather, it is a new approach that does not square with our decisions in *Morales* and *Norfolk & Western*.

*Stare decisis* has "special force" in the area of statutory interpretation, see *Allied-Bruce Terminix Cos.* v. *Dobson, post*, at 284 (O'CONNOR, J., concurring) (internal quotation marks omitted). It sometimes requires adherence to a wrongly decided precedent. *Post*, at 283–284. Here, however, Congress apparently does not think that our decision in *Morales* was wrong, nor do I. In the absence of any "'special justification,'" *post*, at 284 (quoting *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984)), for departing from *Morales*, I would recognize the import of *Morales* and *Norfolk & Western* here, and render the decision that the language of § 1305, in light of those cases, compels. If, at the end of the day, Congress believes we have erred in interpreting § 1305, it remains free to correct our mistake.

## II

Our decisions in *Morales* and *Norfolk & Western* suffice to decide this case along the lines I have described. In addition, however, I disagree with the Court's view that courts can realistically be confined, "in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Ante*, at 233. When they are so confined, the Court says, courts are "simply hold[ing] parties to their agreements,"

and are not "enforcing" any "law," *ante,* at 229. The Court also says that " '[s]ome state-law principles of contract law . . . might well be preempted to the extent they seek to effectuate the State's public policies, rather than the intent of the parties.' " *Ante,* at 233, n. 8 (quoting Brief for United States as *Amicus Curiae* 28).

The doctrinal underpinnings of the notion that judicial enforcement of the "intent of the parties" can be divorced from a State's "public policy" have been in serious question for many years. As one author wrote some time ago:

> "A contract, therefore, between two or more individuals cannot be said to be generally devoid of all public interest. If it be of no interest, why enforce it? For note that in enforcing contracts, the government does not merely allow two individuals to do what they have found pleasant in their eyes. Enforcement, in fact, puts the machinery of the law in the service of one party against the other. When that is worthwhile and how that should be done are important questions of public policy. . . . [T]he notion that in enforcing contracts the state is only giving effect to the will of the parties rests upon an . . . untenable theory as to what the enforcement of contracts involves." Cohen, The Basis of Contract, 46 Harv. L. Rev. 553, 562 (1933).

More recent authors have expressed similar views. See, *e. g.,* Braucher, Contract Versus Contractarianism: The Regulatory Role of Contract Law, 47 Wash. & Lee L. Rev. 697, 699 (1990) ("Mediating between private ordering and social concerns, contract is a socioeconomic institution that requires an array of normative choices. . . . The questions addressed by contract law concern *what* social norms to use in the enforcement of contracts, not whether social norms will be used at all"). Contract law is a set of policy judgments concerning how to decide the meaning of private agreements, which private agreements should be legally enforceable, and

what remedy to afford for their breach. The Court fails to recognize that when a State decides to force parties to comply with a contract, it does so only because it is satisfied that state policy, as expressed in its contract law, will be advanced by that decision.

Thus, the Court's allowance that " '[s]ome state-law principles of contract law . . . might well be preempted to the extent they seek to effectuate the State's public policies, rather than the intent of the parties,' " *ante*, at 233, n. 8 (quoting Brief for United States as *Amicus Curiae* 28), threatens to swallow all of contract law. For example, the Court observes that on remand, the state court will be required to decide whether petitioner reserved the right to alter the terms of its frequent flyer program retroactively, or instead only prospectively. *Ante*, at 234. The court will presumably decide that question by looking to the usual "rules" of contract interpretation to decide what the contract's language means. If the court finds the language to be ambiguous, it might invoke the familiar rule that the contract should be construed against its drafter, and thus that respondents should receive the benefit of the doubt. See 2 E. Farnsworth, Farnsworth on Contracts § 7.11, pp. 265–268 (1990) (hereinafter Farnsworth). That rule of contract construction is not essential to a functional contract system. It is a policy choice that *our* contract system has made. Other such policy choices are that courts should not enforce agreements unsupported by consideration, see 1 Farnsworth § 2.5; but cf. J. Barton, J. Gibbs, V. Li, & J. Merryman, Law in Radically Different Cultures 579 (1983) (other legal systems enforce certain agreements not supported by consideration); that courts should supply "reasonable" terms to fill "gaps" in incomplete contracts, see 2 Farnsworth §§ 7.15–7.17; the method by which courts should decide what terms to supply, see C. Fried, Contract as Promise 60, 69–73 (1981); Charny, Hypothetical Bargains: The Normative Structure of Contract Interpretation, 89 Mich. L. Rev. 1815, 1816, 1820–1823

(1991); Ayres & Gertner, Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules, 99 Yale L. J. 87, 91 (1989) (all suggesting different policy considerations that should inform how courts fill contractual gaps); and that a breach of contract entitles the aggrieved party to expectation damages most of the time, but specific performance only rarely, see 3 Farnsworth, ch. 12; but cf. R. David & J. Brierley, Major Legal Systems in the World Today 302 (1985) (former Soviet Union routinely awarded specific performance). If courts are not permitted to look to these aspects of contract law in airline-related actions, they will find the cases difficult to decide.

Even the doctrine of unconscionability, which the United States suggests as an aspect of contract law that "might well be preempted" because it "seek[s] to effectuate the State's public policies, rather than the intent of the parties," Brief for United States as *Amicus Curiae* 28, cannot be so neatly categorized. On the one hand, refusing to enforce a contract because it is "unfair" seems quintessentially policy oriented. But on the other, "[p]rocedural unconscionability is broadly conceived to encompass not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and an inequality of bargaining power." 1 Farnsworth § 4.28, at 506–507 (footnotes omitted). In other words, a determination that a contract is "unconscionable" may in fact be a determination that one party did not intend to agree to the terms of the contract. Thus, the unconscionability doctrine, far from being a purely "policy-oriented" doctrine that courts impose over the will of the parties, instead demonstrates that state public policy cannot easily be separated from the methods by which courts are to decide what the parties "intended."

"[T]he law itself imposes contractual liability on the basis of a complex of moral, political, and social judgments." Fried, *supra*, at 69. The rules laid down by contract law for determining what the parties intended an agreement to

mean, whether that agreement is legally enforceable, and what relief an aggrieved party should receive, are the end result of those judgments. Our legal system has decided to allow private parties to invoke the coercive power of the State in the effort to enforce those (and only those) private agreements that conform to rules set by those state policies known collectively as "contract law." Courts cannot enforce private agreements without reference to those policies, because those policies define the role of courts in deciding disputes concerning private agreements.

For these reasons, I would reverse the judgment of the Illinois Supreme Court.