**ROBERTS DISTRIBUTOR, INC., Plaintiff,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

**No. IP 94–1631–C D/F.**

United States District Court, S.D. Indiana, Indianapolis Division.

March 4, 1996.

Karen Gray, Cohen & Malad, Indianapolis, IN, for Roberts Distributor Inc.

John R. Maley, Barnes & Thornburg, Indianapolis, IN, for Federal Express Corporation.

**ENTRY**

FOSTER, United States Magistrate Judge.

### Discussing dismissal for lack of subject matter jurisdiction and remand.

This cause is before this magistrate judge pursuant to the parties' consents and the reference of the assigned district judge.[1] The Court *sua sponte* raised the issue of an apparent lack of subject matter jurisdiction and invited the parties' advice. The parties submitted memoranda on the issue. For the reasons set forth below, the Court concludes that it lacks subject matter jurisdiction of this cause. Because the cause was thus wrongly removed, it is remanded, by separate order, to the originating state court.

### *Background.*

The following factual background is taken from the apparently undisputed facts asserted by the parties in their summary judgment papers.[2]

1. Federal Express is an all cargo air carrier, operating under authority of a certificate issued by the United States Department of Transportation through the Federal Aviation Administration. (Declaration of Betty L. Fuller ("Fuller"), ¶ 14 and Exhibit A).

2. Roberts Distributor ("Roberts") executed a "Powership 3 Software License and Placement Agreement" ("Agreement") dated August 11, 1993. (Fuller, ¶ 16 and Exhibit C). This Agreement in part licensed Roberts to use the Powership 3 Automated Shipping System equipment and software. The Powership 3 system is a computerized device provided to customers by Federal Express for their convenience. It eliminates the need for a customer to complete a paper airbill. (*Id.*, ¶ 6 and Exhibit C). (Declaration of Bruce Pallman ("Pallman"), ¶ 2). A customer tendering a package *via* the Powership 3 system is prompted by a computer terminal to supply all essential information that is normally entered on a paper airbill. (*Id.*, ¶ 7).

3. The Agreement contained the following section:

SECTION 11. TERMS AND CONDITIONS OF CARRIAGE. Customer agrees that carriage by FedEx of any shipments tendered pursuant to this Agreement shall be in accordance with all the terms, conditions and limitations of liability contained in the Service Guide, as amended from time to time. Customer agrees to comply in all respects with the terms and conditions of the Service Guide, which is incorporated into this Agreement by reference. In the event of a conflict between this Agreement and the Service Guide, the Service Guide will control.

(Fuller, Exhibit C).

4. After execution of the Agreement and on or about August 25, 1994, Roberts tendered a package to Federal Express in the state of Indiana for interstate carriage to the state of New York under Federal Express package tracking number 300–1286–48483 ("the shipment"). (Fuller, ¶¶ 3, 4; Pallman, ¶ 1). The package was tendered using the Powership 3 system. (Fuller, ¶ 5; Pallman, ¶ 2).

5. Roberts made the following designations for the shipment through the Powership 3 system:

a. A declared a value of $500.00. (Fuller, ¶ 9; Pallman, ¶ 4).

b. Shipment *via* Federal Express' "Priority Overnight" service, which required Federal Express to deliver the shipment

---

1. Consent of Plaintiff, June 21, 1995; Consent of Defendant, June 21, 1995; Order of Reference, June 22, 1995.

2. The only pleading on file is a copy of the plaintiff's one-page small claims court "Notice of Claim/Summons" which is attached to Federal Express' Notice of Removal. The Notice of Claim states only that "the Defendant is indebted to the Plaintiff in the sum of $6,000.00" for the reason, "Failure to obtain proper funds on COD order". (Notice of Removal, Exhibit A). We refer to the factual and legal contentions asserted in the parties' summary judgment papers only as background for our consideration of the jurisdictional matter. No findings or conclusions on the merits of the parties' claims or defenses are made.

the next business morning. (Fuller, ¶ 19; Pallman, ¶ 6).

    c. Shipment *via* Federal Express' "Collect on Delivery" (C.O.D.) service. (Fuller, ¶ 10; Pallman, ¶ 1).

    d. Collection of $6,177 in "secured" funds. (Fuller, ¶ 11; Pallman, ¶¶ 4, 5).[3]

    6. Federal Express delivered the shipment and collected and delivered to Roberts the three documents represented in Exhibit B to the Fuller Declaration. (Fuller, ¶ 15; Pallman, ¶ 7).

    7. The Federal Express Service Guide contained the following terms:

> We offer C.O.D. Service consisting of carriage of goods to the recipient, collection of a check or money order issued by or on behalf of the recipient and made payable to the shipper, and delivery of the check or money order to the shipper of the goods. ... In collecting the C.O.D. Amount, we will accept a business, personal, or certified check, cashier's check or money order. If the shipper so specifies on the C.O.D. Airbill, payment by either cashier's check or money order only will be accepted.

(Service Guide, p. 151 in Fuller, Exhibit D).

> Checks (including cashier's, certified, business and personal checks) and money orders for the C.O.D. Amount will be collected at the shipper's sole risk, including, but not limited to, all risk of

non-payment, fraud and forgery, and we will not be liable upon any such instrument.

*(Id.).*

> Our liability for loss, damage, delay, misdelivery, misinformation, nondelivery, failure to collect the C.O.D. Amount, failure to collect the specified form of payment, collection of an instrument in the wrong amount or failure to deliver the collected instrument to the shipper, will be limited to the declared value indicated by the shipper, subject to the limitations of, and restrictions on, such values referenced in this Service Guide.

*(Id.).*

Roberts alleges that the three documents collected by Federal Express as C.O.D. payment were counterfeit money orders. It claims that Federal Express thus breached their contract by failing to obtain "secured checks" in return for release of its shipped goods. Federal Express contends that, because the contract allocated the risk of loss due to "non-payment, fraud and forgery" to Roberts, Federal Express fulfilled its contractual obligations by collecting "what appeared to be money orders". (Defendant's Summary Judgment Brief, p. 1). Federal Express also contends that the contract and federal common law limits its liability to $500, the value Roberts declared for the shipment.[4]

---

**3.** Ms. Fuller's Declaration states that "The Federal Express Service Guide defines secured funds as cashier's checks or money orders." (Fuller, ¶ 11). No citation is made to the Service Guide and we were unable to find such a reference therein. Neither Federal Express' Statement of Material Facts nor its summary judgment brief contends that the Service Guide defines the term "secured check" or "secured funds". Although Roberts Distributor argued that "[w]hat the parties intended when Roberts instructed Federal Express to obtain only a 'secured check' is also a question of fact that precludes summary judgment", (Plaintiff's Summary Judgment Response, p. 5), it offered no contention regarding its intended meaning for the term, no contention that money orders are not "secured checks", and no contention that Federal Express breached the contract solely by collecting what purported to be money orders. The only relevant item in Roberts Distributor's Statement of Material Issues does not suggest any issue of fact whether

money orders would qualify as secured funds or secured checks under the contract:

> Federal Express did not collect "checks" or "money orders" or any such "instrument" of any kind. Federal Express did not "collect" anything that purported to be what the collection portion of the contract required it to receive in exchange for the shipment in question. Federal Express received items that did not "purport" to be much more than slips of unsigned copy paper with the requisite dollar amounts typed on them.

(S.M.I., ¶ 4).

**4.** Apparently, Roberts Distributor does not contend that authentic money orders would not qualify as "secured funds" under the contract (see note 3). Roberts Distributor also does not appear to contend that Federal Express would be liable if facially valid and authentic money orders or other "secured funds" are not paid due to fraud or insufficiency of funds.

Roberts commenced this suit in September 1994 by filing a Notice of Claim in the Marion County Small Claims Court, Decatur Township Division. Notice of Removal, Exhibit A. Federal Express was served on September 29, 1994. *Id.,* ¶ 2. On October 28, 1994, Federal Express filed its Notice of Removal in this Court pursuant to 28 U.S.C. § 1446. In relevant part, the Notice reads:

3. The Lawsuit is a civil action alleging that Fed Ex, a federally certificated air carrier, failed to obtain proper funds on a interstate C.O.D. shipment.

4. Subject-matter jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 as this action raises a federal question. *See, e.g., North American Phillips Corp. v. Emery Air Freight,* 579 F.2d 229, 23334 [*Sic* ] (2d Cir.1978); *Angela Cummings, Inc. v. Purolator Courier Corp.,* 670 F.Supp. 92 (S.D.N.Y.1987).

5. Removal to this Court is proper under 28 U.S.C. § 1446.

While considering Federal Express' motion for summary judgment, the Court noticed an apparent lack of subject matter jurisdiction and invited the parties' advice on the issue.

### Standards.

■ Because the parties have not contested the applicable standards and adjudication does not turn on their details, we set them forth only briefly. "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant ... to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Under 28 U.S.C. § 1331, district courts have original jurisdiction of civil actions "arising under the Constitution, laws, or treaties of the United States." In addition, under 28 U.S.C. § 1337, the district courts have original jurisdiction of "any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies...." A case "arises under" a federal law when an essential element of the plaintiff's cause of action depends for its resolution upon the validity, construction, or effect of federal law. *Franchise Tax Board of the State of California v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 9–11, 103 S.Ct. 2841, 2846–47, 77 L.Ed.2d 420 (1983); *Gully v. First National Bank in Meridian,* 299 U.S. 109, 114, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936); *Rice v. Panchal,* 65 F.3d 637, 639 (7th Cir. 1995); *Seinfeld v. Austen,* 39 F.3d 761, 763 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1998, 131 L.Ed.2d 1000 (1995).[5] While § 1337(a) is specifically limited to actions arising under Congressional acts, § 1331's phrase "laws ... of the United States" includes federal common law as a basis for jurisdiction. *Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

### Discussion.

■ We start with an examination of the two cases relied upon by Federal Express in its notice of removal and on which it still chiefly relies. In *North American Phillips Corp. v. Emery Air Freight,* 579 F.2d 229 (2nd Cir.1978), North American Phillips ("Norelco") contracted with Emery Air Freight to transport goods from a warehouse in Nevada to Norelco's Long Island, New York plant. Emery was an "air freight forwarder, certified by the CAB [Civil Aeronautics Board] and operating under tariffs filed with the CAB pursuant to the Federal Aviation Act, 49 U.S.C. §§ 1301 *et seq.*" *Id.,* at 231 n. 1. Emery had the goods transported by truck from Nevada to San Francisco and flew them from there to New York City. On arrival, Emery loaded the goods onto two trucks for final delivery. One of the trucks was hijacked *en route* and the goods stolen. Norelco presented a claim for the value of the goods lost, $114,003.00, which Emery refused on the ground that its federal tariff limited its liability for loss to $.50 per pound

---

**5.** The Supreme Court has not distinguished the meanings of "arising under" in § 1331 and

§ 1337. *Franchise Tax Board,* 463 U.S. at 8 n. 7, 103 S.Ct. at 2845 n. 7.

unless a higher value was declared and Norelco did not declare a higher value. Emery tendered a check for $10,527.50, amounting to $.50 per pound. Norelco returned Emery's check over a year later and filed suit in New York state court. Emery removed the action to federal court under 28 U.S.C. § 1441(b), asserting that Norelco's claim presented a federal question. Arguing that the terms of its federal tariff governed the dispute, Emery asserted three defenses to Norelco's claims: (1) Norelco's claims were untimely because the tariff required all suits to be instituted within one year of the denial of a claim; (2) the tariff relieved Emery of liability except for its own negligence, and it was not negligent; and (3) the tariff limited its liability to $.50 per pound in the absence of a higher declared value. The district court rule in Emery's favor. It found that Emery was not negligent and thus could avail itself of the tariff's exculpatory clause, and that Norelco's suit was not commenced within one year of the denial of its claim and was therefore untimely. On appeal, the Second Circuit raised the issue of subject matter jurisdiction for the first time and held that federal question jurisdiction existed under 28 U.S.C. §§ 1331 and 1337. The court concluded that, because the statutory and regulatory scheme of the Federal Aviation Act of 1958 preempted state law, the determination of the parties' rights and liabilities was governed, not by their agreement or principles of state contract law, but by the terms of Emery's federal tariff as interpreted according to federal law. Thus, the court held that Norelco's claim arose under federal law.

The shipment at issue in *Angela Cummings, Inc. v. Purolator Courier Corp.*, 670 F.Supp. 92 (S.D.N.Y.1987), occurred after the 1977 and 1978 deregulations of air carriers. In that case, the plaintiff shipper challenged the district court's jurisdiction after the defendant carrier removed its suit to recover for lost goods. The district court followed the holding of *North American Phillips* which, it concluded, had survived deregulation:

The validity of *Phillips* has not been undermined, as plaintiff argues, by the passage of the Airline Deregulation Act. Deregulation has not eliminated federal common law regarding limitations of interstate air carrier liability. As the Eighth Circuit Court of Appeals stated:

The purpose of deregulation was to allow competition and the marketplace to determine rates and practices in the air transportation industry. *See* 49 U.S.C. § 1302(4) (1982). Congress, however, has not relinquished complete control over air transportation ... Given Congress' retention of significant control over air transportation, we hold that federal common law governs [the air carrier's] liability.

*Arkwright–Boston Mfrs· v. Great Western Airlines*, 767 F.2d 425, 427 (1985). Defendant's conduct is thereby governed by federal common law, which, pursuant to § 1331, confers original jurisdiction upon this court.

*Angela Cummings,* 670 F.Supp. at 94 (citations omitted). The court offered no other rationale or explanation for its holding.

Regardless of the correctness of *North American Phillips* analysis of the scope of § 403(b)'s tariff requirements and their ability to confer federal question jurisdiction, it is clear that the statutory foundations for its analysis no longer existed with respect to the shipment at issue in this case.

Prior to deregulation, the Federal Aviation Act of 1958 ("1958 Act"), Pub.L. 85–726, 72 Stat. 731, as amended prior to July, 1994, 49 U.S.C.App. § 1301 *et seq.* (1976), required every air carrier[6] to publicize and file with the Civil Aeronautics Board "tariffs showing all rates, fares, and charges for air transportation ... and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation." 49 U.S.C.App. § 1373(a) (1976). Air carriers were forbidden to "charge or demand or collect or receive" any compensation varying from their filed tariffs, to refund or

---

**6.** Defined, in summary, as any citizen of the United States who undertakes to engage in the interstate carriage of persons or property as a common carrier for compensation or hire. 49 U.S.C.App. § 1301(4), (10), and (21) (1976).

remit any such compensation, or to extend any privileges or facilities which varied from their tariffs. *Id.,* § 1373(b). The 1958 Act imposed on every air carrier the duty to establish, observe, and enforce "just and reasonable" rates, classifications, rules, regulations, and practices, *id.,* § 1374(a)(1), and empowered the Board to prescribe an air carrier's rate or its "classification, rule, regulation, or practice affecting such rate" whenever the Board determined that such rate or practice was unjust, unreasonable, discriminatory, preferential, or prejudicial, *id.,* § 1482(d). The regulations of the Civil Aeronautics Board required air carriers to list in their tariffs, in addition to their rates and charges, "[a]ll of the terms, conditions, or other provisions which affect the rates, fares, or charges for air transportation named in the tariff", 14 C.F.R. § 221.38(a)(2), and "[a]ll other provisions and charges which in any way increase or decrease the amount to be paid on any shipment ... or which in any way increase or decrease thè value of the services rendered to the shipper....", *id.,* § 221.38(a)(4).

Many courts, following the reasoning of *North American Phillips,* held that this statutory and regulatory scheme preempted state law and established federal common law as governing all issues of an air carrier's rights and liabilities *vis-a-vis* its customers with regard to its carriage services. The Second Circuit in *North American Phillips* had interpreted the 1958 Act in the context of the other major interstate commerce regulatory acts—the Interstate Commerce Act, the Federal Communications Act, and the Motor Carrier Act—all of which, it found, were intended to "establish a uniformity and

equality of rates in all interstate transactions," *id.,* at 232, and had "occupied the field to the exclusion of state law", *id.,* at 234. At the time, these other commerce acts contained similar provisions: (1) requiring carriers to file tariffs listing all terms for their rates, services, practices, rules, conditions, *etc.;* [7] (2) prohibiting carriers from charging or collecting rates or providing services which varied from their tariffs, and from providing discriminatory rebates or refunds; [8] (3) authorizing the relevant administrative agencies to suspend unjust, unreasonable, discriminatory, or predatory terms in carriers' tariffs and to prescribe terms in their stead; [9] (4) providing administrative and criminal penalties for violations; [10] and (5) imposing liability on carriers for loss or injury to goods transported and providing for private civil actions to recover.[11] The Federal Aviation Act of 1958 contained all of these provisions except the last: it did not impose air carrier liability or provide for a private cause of action. The Second Circuit in *North American Phillips* held that the policy against discriminatory practices which was evident in the 1958 Act substituted for this deficiency. Therefore, although the Act provided for only administrative enforcement of its provisions, the court concluded that, in order to better effectuate national uniformity of rates and practices, litigation between carriers and customers must be governed by carriers' federal tariffs as interpreted and supplemented by federal common law. *North American Phillips,* 579 F.2d at 233.[12] Because federal common law is thus the "pivotal issue" in carrier-shipper suits, "one that is basic in the determination of the conflict between the parties", *id.,* at 233, the court

7. 47 U.S.C.A. §§ 203(a), 205 (1991); 49 U.S.C.App. § 6(1)–(4) (1959); 49 U.S.C.App. § 317(a) (1963).

8. 47 U.S.C.A. § 203(c); 49 U.S.C.App. §§ 2, 6(6); 49 U.S.C.App. § 317(b), (d).

9. 47 U.S.C.A. § 205; 49 U.S.C.App. § 15; 49 U.S.C.App. § 316(e).

10. 47 U.S.C.A. §§ 203(e), 205(b); 49 U.S.C.App. §§ 6(10), 10; 49 U.S.C.App. § 322.

11. 47 U.S.C.A. §§ 206, 207; 49 U.S.C.App. §§ 8, 9; 49 U.S.C.App. §§ 20(11), 319.

12. "Although the liability of air carriers is not created by statute, as is the case with surface carriers, the prohibition against unlawful preferences is equally strong with regard to the former as the latter. For example, 49 U.S.C.App. § 1472(d) makes it unlawful to give or receive rebates or commissions in shipments by air. It follows that both the rights and liabilities as between an airline and a shipper are determined by the shipper's valid tariffs." *North American Phillips,* 579 F.2d at 233 (citations and footnote omitted).

held that such cases arise under federal law and confer federal question jurisdiction on the courts. Although the *Angela Cummings* court also recognized that carrier-shipper suits could not "arise under" the 1958 Act because it lacked provisions imposing carrier liability or authorizing private suits, and although it recognized that "[a] federal statute that does not create or imply private rights of action does not present a federal question pursuant to 28 U.S.C. § 1331 on behalf of private individuals", *Angela Cummings*, 670 F.Supp. at 94, it nonetheless followed *North American Phillips'* holding that such claims arose under federal common law. These cases and their progeny therefore hold that all issues affecting rights and liabilities between air carriers and their customers, whether addressed in the carriers' tariffs or not, are inherent parts of the carriers' rates and governed by uniform federal common law:

> Limitations of liability and cargo valuations are inherent parts of the rates, and the statutory mandate of uniformity must therefore apply to the liabilities which attend the carriage of goods. If a shipper in one state could hold a carrier to a higher standard or degree of liability than a shipper in another state who has paid the same rate, the first shipper would be getting a preference not granted to the second. This the various commerce acts prohibit.
>
> \* \* \* \* \* \*

It follows that both the rights and liabilities as between an airline and a shipper are determined by the shipper's valid tariffs. In some cases, this conclusion is reached by treating the tariff rate as a matter of law instead of contract. In other cases, it is said that the tariff becomes part of the contract between the parties. Regardless of the rationale, it is clear that a carrier's valid federal tariffs which are applicable to the shipment at issue govern not only the nature and extent of its liability, but also the nature and extent of the shipper's right of recovery.

*North American Phillips*, 579 F.2d at 232–33 (citations and footnotes omitted).

Most courts have held that the other major interstate commerce Acts confer federal jurisdiction over carrier-customer suits because they provide that the parties' rights and liabilities would be governed by the terms of the carriers' tariffs and the provisions of the Acts. *See, e.g., Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 41 S.Ct. 584, 65 L.Ed. 1094 (1921) (Interstate Commerce Act); *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1093–96 (3rd Cir.1995) (Federal Communications Act). *But see MCI Telecommunications Corp. v. Credit Builders of America, Inc.*, 980 F.2d 1021 (5th Cir.) (Federal Communications Act), *vacated and remanded on other grounds*, 508 U.S. 957, 113 S.Ct. 2925, 124 L.Ed.2d 676 (1993), *prior opinion reinstated*, 2 F.3d 103 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 472, 126 L.Ed.2d 424 (1993). But, as indicated, the Interstate Commerce Act, the Federal Communications Act, and the Motor Carrier Act all explicitly provided for carrier liability to customer-shippers and private causes of action.[13] *North American Phillips'* easy discovery of federal jurisdiction despite the 1958 Act's lack of similar Congressional authorization is highly suspect under the Supreme Court's subsequently developed regime for that determination. *See Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).[14] The Court need not

13. The version of the interstate commerce act interpreted by the Supreme Court in *Esteve* also provided for carrier liability and private actions, Act of February 4, 1887, 49th Cong., Sess. II, chap. 104, §§ 8, 9, 24 Stat. 379, 382, and included tariff provisions similar to the other commerce acts, *id.*, § 6; Act of June 29, 1906, Pub. No. 337, 59th Cong., Sess. I, chap. 3591, § 6, 34 Stat. 584, 586–87; Act of June 18, 1910, Pub. No. 218, 61st Cong., Sess. II, chap. 309, §§ 7, 9, 10, 12, 36 Stat. 539, 545–46, 548–49, 551. The Act also contained an explicit pronouncement that any unjust, unreasonable, or discriminatory rate or practice was prohibited and declared unlawful. Act of June 18, 1910, § 7, 36 Stat. 516; Act of Feb. 4, 1887, §§ 2, 3, 24 Stat. 379, 380.

14. After explicitly including virtually identical provisions for carrier liability and private enforcement in the other commerce acts, Congress failed to do the same in the Federal Aviation Act of 1958 or its amendments, although the 1958 Act otherwise mirrored those acts. Congress

scrutinize *North American Phillips'* and its progeny's rationale for finding federal jurisdiction under the 1958 Act, however, because, while those cases hold that shipper-carrier suits arise under federal common law, it is a common law that derives from and depends upon the existence of a Congressional policy expressed through a statutory and regulatory scheme and both the policy and the scheme have undergone significant changes since *North American Phillips*. *See generally, First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1121–22 (3rd Cir.1984).

■ Beginning in 1977, Congress and the responsible federal agencies [15] progressively deregulated domestic air carriers until, by the time of the recodification of Title 49 in 1994, Pub.L. 103–272, 108 Stat. 745, there was no remaining authority to regulate prices or practices of air carriers providing domestic interstate services.[16] Congress' intent under the present statutory scheme is to "plac[e] maximum reliance on competitive market forces and on actual and potential competition". 49 U.S.C.App. § 40101(a)(6). *See American Airlines v. Wolens*, —— U.S. ——, ——; 115 S.Ct. 817, 824, 130 L.Ed.2d 715 (1995). The parties do not dispute that the package at issue in this case was sent on or about August 25, 1994, over a month after the enactment of the 1994 recodification on July 5, 1994. (Fuller Declaration, ¶¶ 3, 4; Pallman Declaration, ¶ 1). On the date the package was sent, therefore, there were no

tariff requirements in the relevant statutes or regulations; no provisions prohibiting, or authorizing regulation of, unjust, unreasonable, discriminatory, predatory, or prejudicial rates or practices; and no imposition of liability on carriers or authorization for private causes of action. With the substantial change in federal policy from imposition of national uniformity to reliance on competitive markets, and the repeal of virtually all regulations of, and authority to regulate, domestic air carriers, the rationale of *North American Phillips* and *Angela Cummings* and their progeny are vitiated and no statutory or regulatory foundation exists on which to construct a federal common law governing air carrier-shipper suits.

■ Although *Angela Cummings* was decided after the enactment of the 1977 and 1978 deregulations (but before the subsequent regulatory and final 1994 statutory deregulations), the court there found that deregulation did not affect federal jurisdiction over carrier-shipper suits because Congress still retained "significant control over air transportation". *Angela Cummings*, 670 F.Supp. at 94. The court did not describe those significant controls, but its citation to *Arkwright–Boston* for the proposition reveals two possibilities:

> Congress, however, has not relinquished complete control over air transportation. *See First Pennsylvania Bank v. Eastern Airlines, Inc.*, 731 F.2d 1113, 1115 (3d Cir.1984). According to § [*sic*] 49 U.S.C.

did, however, authorize a private cause of action by any "party in interest" to enforce the certificate requirement of 49 U.S.C.App. § 1371(a) (1976). Congress apparently knew how to authorize a private cause of action in the commerce regulatory context and deliberately chose not to do so under the 1958 Act. *North American Phillips'* justification of federal jurisdiction and common law creation on the sole basis of the Congressional objective to establish national uniformity of air carriers' rates and practices would not appear to withstand scrutiny under *Merrell Dow* and *Sierra Club*. It thus appears that Congress decided to rely on administrative and criminal enforcement, rather than private suits, to effectuate nondiscriminatory rates and practices by air carriers. The court in *Angela Cummings* recognized the standard of *Merrell Dow* but inexplicably failed to apply it, or even discuss it, in relation to *North American Phillips'* rationale. Finally, if Congress' purpose in these

acts was to promote the general public welfare by eliminating discriminatory burdens on the instrumentalities of interstate commerce, and not specifically to protect shippers as a separate class, it would be difficult under *Merrell Dow* to find in the 1958 Act an implied cause of action for shippers.

15. As part of the deregulation, the Civil Aeronautics Board was abolished and the remaining regulatory authority was assumed by the Secretary of Transportation.

16. Deregulation began with the 1977 cargo deregulation act, Pub.L. No. 95–163, 91 Stat. 1278, and the Airline Deregulation Act of 1978, Pub.L. 95–504, 92 Stat. 1705. In addition, much of the actual deregulation occurred as the responsible agencies exercised statutory grants of authority to exempt air carriers from tariff and other statutory requirements.

§ 1305(a)(1) (1982), no state except in circumstances not relevant here "shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier * * *." Under 49 U.S.C. § 1482(d) (1982), the Civil Aeronautics Board is empowered to prescribe rates and practices after determining that an air carrier is charging unjust rates or that a rule affecting rates is unjust. Given Congress' retention of significant control over air transportation, we hold that federal common law governs Great Western's liability.

*Arkwright–Boston*, 767 F.2d at 427. Regarding the first cited control, it is now settled that the Act's "savings clause", § 1305(a) (now recodified as § 41713(b)(1)), does not prohibit state court adjudication of voluntary agreements between carriers and shippers and does not "channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services." *Wolens,* —— U.S. at —— – ——, 115 S.Ct. at 824–25. Regarding the second basis for control, § 1482(d), in addition to being repealed by the 1994 recodification, the court was simply wrong: the 1977 Act specifically eliminated the agency's power to prescribe a carrier's rates and practices when it found them to be unjust or unreasonable. 1977 Act, § 18, 91 Stat. 1286–87. Federal Express did not suggest any other controls Congress retained over air carriers after the 1994 recodification which might justify federal jurisdiction.

In its response to the Court's request for advice, Federal Express cited to other cases to support its contention that federal common law still governs carrier rights and liabilities after deregulation. Of these, *Downey v. Federal Express Corp.,* No. C–92–4956 MHP, 1993 WL 463283, 1993 U.S.Dist. LEXIS 16114 (N.D.Calif, Oct. 29, 1993), and *Milam Audio Co. v. Federal Express Corp.,* No. 93–1279, 1994 WL 602716, 1994 U.S.Dist. LEXIS 15585 (C.D.Ill., Mar. 22, 1994), rely on citations to *North American Phillips* and

*Angela Cummings,* and therefore need no further discussion. *Associated X–Ray Corp. v. Federal Express Corp.,* No. 3:93CV02209(AVC), "Ruling on Plaintiff's Motion to Remand" (D.Conn., June 30, 1994), relies primarily on the reasoning of *North American Phillips, Angela Cummings,* and *Downey. First Pennsylvania Bank v. Eastern Airlines, Inc.,* 731 F.2d 1113 (3rd Cir. 1984), goes into more detail. To support its recognition of a self-existing federal common law governing interstate carrier rights and liabilities, the court initially relies on cases which applied such a common law before the constriction of federal common law under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), or which interpreted specific statutory provisions not relevant here. The court then points to the 1958 Act's savings clause "preserving 'the remedies now existing at common law or by statute....'" *First Pennsylvania,* 731 F.2d at 1117. The provision quoted, 49 U.S.C.App. § 1506 (1976), states that "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." [17] This language, however, did not authorize, preserve, or revive any body of federal common law independent of its statutory and regulatory authorization, and it did not incorporate common law remedies into the statutory scheme; it merely left existing common law and remedies alone. The 1958 Act was enacted long after *Erie v. Tompkins* and thus could not have revived an already rejected basis for creation of independent federal common law, and, as indicated above, the statutory and regulatory foundation on which the existing federal common law of carrier liability depended was completely repealed by the time Federal Express' liability was implicated in this case. We are not persuaded by *First Pennsylvania's* rationale for recognizing an independent federal common law of carrier liability and concluding that deregulation merely eliminated the applicability of the doctrine of primary jurisdiction. *Deiro v. American Airlines, Inc.,* 816 F.2d 1360 (9th Cir.1987), and *Zubaz, Inc. v.*

---

**17.** This section was significantly pared in the recodification: "A remedy under this part is in addition to any other remedies provided by law." 49 U.S.C.App. § 40120(c).

*Federal Express Corp.,* 864 F.Supp. 723 (W.D.Tenn.1994), follow *First Pennsylvania's* reasoning.

■ Federal Express has not persuaded us that federal courts are authorized, independent of any statutory or regulatory basis, to create federal common law governing contract disputes between interstate air carriers and their customers. The Supreme Court has consistently declared that there is no general federal common law, *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981), and that federal common law exists in only "few and restricted" instances, *City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 313, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981); *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963). Where Congress has not authorized the courts to develop substantive rules of decision, federal common law is authorized only "in such narrow areas as those concerned with the rights and obligations of the U.S., interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Industries,* 451 U.S. at 641, 101 S.Ct. at 2067 (footnotes omitted). The statutory and regulatory scheme which regulated air carriers and supported the application of federal common law has been dismantled. In order to establish the continuing applicability of an independent federal common law governing air carriers, therefore, Federal Express must demonstrate that the interpretation and enforcement of private contracts between shippers and carriers "implicates a uniquely federal interest", meaning that there exists "an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." *Northrop Corp. v. AIL Systems, Inc.,* 959 F.2d 1424, 1426 (7th Cir.1992). Federal Express did not so demonstrate. In the absence of such argument, and based on its own research, the Court found no greater federal interest in the uniform resolution of private contract disputes between interstate air carriers and their customers than in the resolution of other unregulated interstate contracts. The Supreme Court found no such interest in a recent case, cited above, that apparently escaped the parties' notice. In *American Airlines, Inc. v. Wolens,* —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), holders of frequent-flyer credits brought state law breach of contract claims in state court against the issuing air carrier after it revised the redemption rules under which those credits were originally issued.[18] The air carrier argued that the 1978 Act's preemption clause, which provided that "no State ... shall enact or enforce any law ... relating to rates, routes, or services of any air carrier", 1978 Act § 4, 92 Stat. 1708, as amended 49 U.S.C. § 41713(b)(1), prohibited a state from enforcing, through its contract law, agreements between a carrier and its customers because " 'Congress could hardly have intended to allow the States to hobble [competition for airline passengers] through the application of restrictive state laws' ", *Id.,* at ——, 115 S.Ct. at 824. The airline argued that the effect of the preemption clause after deregulation was to leave administrative enforcement as the only remedy for the plaintiffs' complaints. The Supreme Court rejected the airline's argument. Adopting the position of the U.S. Department of Transportation as *amicus curiae,* the Court held that, after the 1977 and 1978 deregulations, air carriers could be sued in state court on state causes of action:

> We do not read the ADA's[19] preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations "and

18. The airline did not remove the case to federal court. It was heard by the Supreme Court on appeal from the state's supreme court presumably under 28 U.S.C. § 1257(a) because the airline claimed federal preemption of the state causes of action.

19. [Our note] This is the "Airline Deregulation Act of 1978", referred to in this Entry as the 1978 Act.

thus do not amount to a State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1)."

\* \* \* \* \* \*

\* \* \* The ADA [1978 Act], as we recognized in *Morales [v. Trans World Airlines, Inc.,]* 504 U.S. [374], at 377–78, 112 S.Ct. [2031] at 2034, [119 L.Ed.2d 157 (1992)], was designed to promote "maximum reliance on competitive means to enforce private agreements. As stated by the United States: "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on needs perceived by the contracting parties at the time." That reality is key to sensible construction of the ADA.

The FAA's [1958 Act's] text, we note, presupposes the vitality of contracts governing transportation by air carriers. Section 411(b), 49 U.S.C.App. § 1381(b), thus authorizes airlines to "incorporate by reference in any ticket or other written instrument any of the terms of the contract of carriage" to the extent authorized by the DOT. And the DOT's regulations contemplate that, upon the January 1, 1983, termination of domestic tariffs, "ticket contracts" ordinarily would be enforceable under "the contract law of the States." 47 Fed.Reg. 52129 (1982). \* \* \*

*Wolens,* —— U.S. at ——–––, 115 S.Ct. at 824–25 (citations omitted). The Court agreed with the United States' contention that the Department of Transportation was neither authorized nor equipped to oversee contract dispute resolutions. It then rejected the alternative of federal court adjudication of such disputes based on federal common law, construing the 1978 Act's savings clause in the process:

Nor is it plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services. The ADA contains no hint of such a role for the federal courts. \* \* \*

The conclusion that the ADA permits state-law-based court adjudication of routine breach of contract claims also makes sense of Congress' retention of the FAA's savings clause § 1106, 49 U.S.C.App. § 1506 (preserving "the remedies now existing at common law or by statute"). The ADA's preemption clause, § 1305(a)(1), read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach of contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*Id.,* —— –– ——, at 825–36 (footnote omitted). See also *Merkel v. Federal Express Corp.,* 886 F.Supp. 561 (N.D.Miss.1995).

### Conclusion.

Because Roberts' claims do not arise under federal law, the Court lacks subject matter jurisdiction of this case. The case was thus improperly removed to this Court and the Clerk will be directed, by separate order, to remand the case to the Marion County Small Claims Court, Decatur Township Division. There will be no order for the payment of costs, expenses, or attorney fees incurred as a result of the removal.