OPINION OF THE COURT
Austin, J.
On this appeal, we address whether intentional tort and fraud claims to recover damages allegedly resulting from the confinement of commercial airline passengers in an airplane remaining on a tarmac outside of a terminal for several hours without affording passengers food, water, clean air, and toilet facilities is preempted by federal law. We also determine whether, in an electronically filed (hereinafter e-filed) action, the failure to annex a complete set of the originally submitted papers in support of a motion for leave to renew or reargue a motion for class certification warrants denial of the motion.
For the reasons that follow, we find that the plaintiff’s intentional tort and fraud claims relate to the provision of airline services and are, therefore, preempted by federal law. We further find that compliance with CPLR 2214 (c) requires that a party seeking leave to renew or reargue cannot rely upon reference to e-filed documents in lieu of annexing a complete set of the originally submitted motion papers.
The plaintiff commenced this putative class action by filing a summons with notice in the Supreme Court, Queens County, on February 13, 2008, against, among others, the defendant Jet-Blue Airways Corporation (hereinafter JetBlue). According to the plaintiffs summons with notice, the nature of the putative class action was one to recover damages for, among other things, false imprisonment, negligence, intentional infliction of emotional distress, fraud and deceit, and breach of contract arising out of an 11-hour confinement of the plaintiff and other passengers in a JetBlue aircraft on the tarmac at John F. *161 Kennedy International Airport (hereinafter JFK) on February 14, 2007.
After it was served with a copy of the complaint on July 15, 2009, JetBlue filed a notice of removal pursuant to 28 USC § 1441 in the United States District Court for the Eastern District of New York (hereinafter the federal court) to remove this case on the basis that the federal court had original jurisdiction over the claims of certain putative class members arising out of the Montreal Convention (Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, reprinted in S Treaty Doc No. 106-45, 1999 WL 33292734, 1999 UST LEXIS 175), as asserted in the complaint. The plaintiff moved in the federal court pursuant to 28 USC § 1447 (c) to remand this action to the Supreme Court, Queens County. In an order dated February 4, 2010, the federal court granted the motion, concluding that it did not have jurisdiction to hear this case since the plaintiff lacked standing to raise Montreal Convention claims.
After this action was remanded to the Supreme Court, Queens County, JetBlue moved, by notice of motion dated April 19, 2010, pursuant to CPLR 3211 (a) (1) and (7), to dismiss the complaint. JetBlue asserted that the plaintiffs tort claims were preempted by the Airline Deregulation Act of 1978 (49 USC § 41713 [hereinafter the ADA]) and the Federal Aviation Act of 1958 (49 USC § 40101 et seq. [hereinafter the FAA]), and that the plaintiff failed to state a cause of action with respect to all five of her claims.
In opposition, the plaintiff submitted, inter alia, a first amended complaint dated April 30, 2010, which differed from the original complaint in that the plaintiff added some factual allegations with respect to the events that occurred on the subject day of travel and concerning the cause of action alleging breach of contract, included an allegation of negligence per se, and deleted any reference to the Montreal Convention.
As directed by the Supreme Court, JetBlue filed a subsequent motion to dismiss the first amended complaint on May 21, 2010, reiterating the same grounds for dismissal as were asserted in its original motion: federal preemption of the tort claims under the ADA and the FAA, and failure to state a cause of action with respect to all claims. At about the same time, by notice of motion dated May 20, 2010, the plaintiff moved for class action certification pursuant to CPLR article 9.
In her first amended complaint, the plaintiff made the following allegations. At 6:15 a.m. on February 14, 2007, she boarded *162 a JetBlue aircraft at JFK that was scheduled to depart for Burbank, California, at 6:45 a.m. The aircraft left the terminal at approximately 6:50 a.m., but remained on the ground for the ensuing 11-hour period until the plaintiff was allowed to exit the aircraft at 5:30 p.m. During the first five hours, the plaintiff remained in her seat with her seat belt fastened, as instructed by JetBlue personnel, who stated that the weather was “holding us up” and that it was necessary to remain seated so that the aircraft could take off on five minutes’ notice. After five hours, JetBlue personnel told passengers that if they wanted to exit the plane and take another flight, they should inform a crew member.
The plaintiff claimed that a nearby passenger requested to exit, but “the flight attendant bullied and intimidated him to stay on the plane,” stating that JetBlue would not assist him with getting another flight and that, in any event, no other flights were available for several days. According to the plaintiff, other passengers demanded to be released from the plane, but JetBlue personnel refused and stated “that if anyone tried to force their way off the aircraft, they would go to prison for 20 years” pursuant to the Federal Patriot Act. The plaintiff asserted that she was “intimidated” and “deceived” by JetBlue personnel’s “false and deceptive statements regarding alternative transportation,” and that JetBlue was aware, or should have been aware, that other flights on other airlines were available within 80 miles of JFK.
During the confinement, the JetBlue flight crew only served “very small amounts of water” and a few snacks after three hours had passed, and then again after a period of eight hours. In addition, after eight hours, the heating, cooling, and ventilation system “shut down,” causing the air to become “sweltering” and making it difficult for passengers to breathe. After 10 hours, the captain informed passengers that the toilet tanks were full and they could not “do a No. 2” because the tanks would overflow.
The plaintiff also alleged that numerous times during the confinement, JetBlue personnel falsely asserted that the plane was “next in line” to return to the terminal and would do so soon, while the plaintiff observed numerous other planes return to the terminal throughout the 11-hour period. Finally, after 11 hours, buses arrived and took the passengers to the terminal, where they waited another two hours to obtain their baggage. Approximately 1,300 other passengers on JetBlue aircraft were similarly affected by JetBlue’s actions at JFK that day.
*163 As a result of the incident, the plaintiff, a comedy writer working in television and film, allegedly missed her friend’s film premiere and “important” business meetings, sustaining “lost business opportunities.” Moreover, she asserted that she had undergone “major shoulder surgery” six months before the incident, and that “her shoulder and hip flexors started to ache,” “her legs began cramping,” and she “suffered from mental distress, anxiety and near panic” after four to five hours of confinement. The plaintiff also averred that she “suffered physical pain for six months afterwards as well as panic and anxiety attacks,” which required treatment and therapy.
In her amended complaint, the plaintiff asserted five causes of action, which alleged false imprisonment, negligence and negligence per se, intentional infliction of emotional distress, fraud and deceit, and breach of contract, respectively.
In an order entered October 12, 2010, the Supreme Court granted certain branches of JetBlue’s motion to dismiss the amended complaint, while denying others. First, the court addressed the express preemption provision of the ADA, which, the court stated, “does not apply to tort claims for personal injury, . . . but . . . does apply to other types of tort claims merely pertaining to the service provided by an airline,” such as fraud, intentional infliction of emotional distress, and false imprisonment (citations omitted). The court concluded that “all of the plaintiffs tort claims, with the exception of negligence causing physical injury, are closely related to the provision of services” by an airline:
“The supply of ‘food, water, electricity, and restrooms to passengers during lengthy ground delays does relate to the service of an air carrier’ (Air Transp. Assn, of Am., Inc. v Cuomo, 520 F3d 218, 223 [2d Cir 2008]), and, thus, tort claims which rest on allegations of insufficient supply have been preempted. Boarding and dehoarding from flights also pertain to the provision of services, and the plaintiffs tort claims based on [JetBlue’s] actions in that regard have been preempted (see Hirsch v American Airlines, 160 Misc 2d 272 [Civ Ct, NY County 1993]; Williams v Express Airlines I, Inc., 825 F Supp 831 [WD Tenn 1993]).”
Accordingly, the court granted those branches of JetBlue’s motion which were to dismiss, as preempted, the causes of action alleging false imprisonment, intentional infliction of emotional *164 distress, and fraud and deceit, and so much of the cause of action alleging negligence as was not predicated on personal injury, and denied those branches of the motion which were to dismiss, on preemption grounds, so much of the cause of action alleging negligence as was predicated on physical injury, and the cause of action alleging breach of contract.
The Supreme Court then determined that the amended complaint adequately stated causes of action alleging negligence predicated on physical injury and breach of contract. Although the court concluded that JetBlue failed to demonstrate by documentary evidence that the cause of action alleging breach of contract was subject to dismissal pursuant to CPLR 3211 (a) (1) since JetBlue did not provide a copy of the relevant contract of carriage, it denied that branch of the motion without prejudice to renewal. The court did not address JetBlue’s argument that the FAA impliedly preempted these two claims, other than by stating that “[t]he remaining branches of the motion are denied as moot.”
In a separate order dated October 7, 2010, the Supreme Court denied, without prejudice to renewal, the plaintiffs motion pursuant to CPLR 902 for class certification as premature, since issue had not yet been joined. Thereafter, JetBlue filed an answer dated October 25, 2010.
By notice of motion dated December 19, 2010, the plaintiff moved for leave to renew or reargue her motion for class certification. In support, the plaintiffs counsel did not attach exhibits to his affirmation, but simply referred to documents by electronic docket entry numbers.[1]
In an order entered February 8, 2011, the Supreme Court denied the plaintiffs motion for leave to renew or reargue her motion for class certification on the procedural ground that the plaintiffs moving papers were “insufficient in as much as the plaintiff failed to furnish a complete copy of the papers relied upon in making the November 18, 2009 [sic] decision.” In a footnote, the court stated, without citing authority, that “[i]t is not sufficient for the plaintiff to merely reference certain docket entries in the affirmation submitted in support of the motion herein.”
The plaintiff appeals from both the order entered October 12, 2010, determining JetBlue’s motion to dismiss the amended *165 complaint, and the order dated January 27, 2011, denying her motion for leave to renew or reargue.
I. Preemption under the ADA
With respect to the Supreme Court’s order granting certain branches of JetBlue’s motion to dismiss the amended complaint on the basis of preemption, the plaintiff contends that the court erred in determining that some of her common-law claims were preempted by the ADA. She argues that the confinement of passengers in a grounded aircraft for an 11-hour period against their will is not related to the provision of services, as interpreted by the ADA’s preemption clause, since passengers do not bargain for or anticipate such lengthy confinement against their will. Moreover, she asserts that the conduct underlying her tort claims are too attenuated from the ADA’s objective of ensuring economic deregulation of the airline industry.
JetBlue contends that the Supreme Court properly determined that the plaintiffs common-law claims were preempted, based on the broad scope of the ADA preemption clause and Air Transp. Assn, of Am., Inc. v Cuomo (520 F3d at 222), a decision by the United States Court of Appeals for the Second Circuit striking down, as preempted, New York legislation directly addressing the provision of services during lengthy tarmac delays. It argues that the claims subject to dismissal are “an impermissible attempt to regulate through state law an airline’s operations and practices during ground delays” and “relate, at their core, to an airline’s services.”
A. Preemption Principles
“A fundamental principle of the Constitution” is that the Supremacy Clause grants Congress the power to preempt state law (Crosby v National Foreign Trade Council, 530 US 363, 372 [2000]; see US Const, art VI, cl 2; State of N.Y. ex rel. Grupp v DHL Express [USA], Inc., 19 NY3d 278, 283 [2012]; People v First Am. Corp., 18 NY3d 173, 179 [2011], cert denied sub nom. CoreLogic, Inc. v Schneiderman, 566 US —, 132 S Ct 1929 [2012]). “[W]ithin Constitutional limits Congress may preempt state authority by so stating in express terms” (Pacific Gas & Elec. Co. v State Energy Resources Conservation & Development Comm’n, 461 US 190, 203 [1983]). In the absence of explicit statutory language, preemption can be implied under field preemption where a review of federal legislation indicates that Congress intended federal law to fully occupy that field, or pursuant to conflict preemption where a state law is in conflict *166 with federal law so that it would be impossible for a party to comply with both (see English v General Elec. Co., 496 US 72, 79 [1990]; Rice v Santa Fe Elevator Corp., 331 US 218, 230 [1947]; Doomes v Best Tr. Corp., 17 NY3d 594, 601 [2011]).
Whatever the form, “the purpose of Congress is the ultimate touchstone in every pre-emption case” (Medtronic, Inc. v Lohr, 518 US 470, 485 [1996] [internal quotation marks and brackets omitted]; see California Fed. Sav. & Loan Assn, v Guerra, 479 US 272, 280 [1987]; People v First Am. Corp., 18 NY3d at 179 [in undertaking a federal preemption analysis, “a court’s sole task is to ascertain the intent of Congress” (internal quotation marks omitted)]). As such, a court must begin, as “in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs” (New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co., 514 US 645, 655 [1995]), “as revealed . . . through the reviewing court’s reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law” (Medtronic, Inc. v Lohr, 518 US at 486).
In recognition of the independent sovereignty of the States, the United States Supreme Court has “long presumed that Congress does not cavalierly pre-empt state-law causes of action” (id. at 485). Accordingly, in “all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied,” it is presumed “that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress” (id. [internal quotation marks and citations omitted]).
These appeals require us to focus our analysis solely on implied preemption or field preemption, which occurs when
“[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . .
[o]r the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject” (Rice v Santa Fe Elevator Corp., 331 US at 230 [citations omitted]).
*167 B. The ADA Preemption Provision
Prior to 1978, the FAA authorized the Civil Aeronautics Board to regulate interstate airline fares and to take administrative action against deceptive trade practices (see Morales v Trans World Airlines, Inc., 504 US 374, 378 [1992]). The FAA did not expressly preempt state regulation and contained a “ ‘saving clause’ ” providing that “ ‘[n]othing ... in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies’ ” (id., quoting 49 USC former Appendix § 1506).
In 1978, Congress amended the FAA by enacting the ADA, reflecting its determination that “maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as variety [and] quality ... of air transportation” (Morales at 378 [internal quotation marks omitted]; see 49 USC § 40101 [a] [6], [12]). “To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision” (id.). In its current form, the preemption provision states, with certain exceptions inapplicable here, that
“a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart” (49 USC § 41713 [b] [l]).[2]
The ADA did not repeal or alter the saving clause in the FAA (see Morales at 379), which has since been revised to recite that “[a] remedy under this part is in addition to any other remedies provided by law” and recodified at 49 USC § 40120 (c) (see Pub L 103-272, § 1 [e], 108 US Stat 745, 1117-1118).
The ADA’s express preemption provision and its language “related to a price, route, or service” have garnered considerable attention in the federal courts. The United States Supreme Court has addressed the provision on three occasions, each time focusing on the phrase “related to.” In Morales, the United States Supreme Court interpreted the phrase “related to” as *168 expressing “a broad pre-emptive purpose” and held that state laws “having a connection with or reference to airline ‘[prices], routes, or services’ ” are preempted under the ADA (Morales at 383-384). Under this standard, the Court held that the ADA preempted application of states’ general consumer protection statutes to enforce a set of guidelines composed by the National Association of Attorneys General purporting to regulate deceptive airline advertising, because those guidelines bore express “reference to” airline fares or prices and, “as an economic matter,” they had a “forbidden significant effect upon fares” (id. at 388). The Court noted, however, that the ADA’s preemptive scope was not limitless, stating that state actions affecting airline prices, routes, and services “in too tenuous, remote, or peripheral a manner” may not be preempted, such as state laws regulating gambling and prostitution as applied to airlines (id. at 390 [internal quotation marks omitted]).
Similarly, in American Airlines, Inc. v Wolens (513 US 219, 226-228 [1995]), the United States Supreme Court held that the ADA preempted claims challenging an airline’s changes to its frequent flyer program as violative of the Illinois Consumer Fraud Act because the claims related to rates and services. However, the Court also held that the ADA’s preemption clause did not “shelter airlines from suits . . . seeking recovery solely for the airline’s alleged breach of its own, self-imposed undertaking[ ]” (American Airlines, Inc. v Wolens, 513 US at 228), although breach of contract claims are limited to the terms of the contract, and any “enlargement or enhancement based on state laws or policies external to the agreement” would be preempted (id. at 233).
In Rowe v New Hampshire Motor Transp. Assn. (552 US 364 [2008]), the United States Supreme Court addressed a similarly worded provision in the Federal Aviation Administration Authorization Act of 1994 (hereinafter the FAAAA) that sought to preempt state regulation of trucking (see 49 USC § 14501 [c] [1]) and its effect on two sections of a Maine statute regulating the delivery of tobacco. The Court reiterated its determinations from Morales in construing the ADA that, inter alia, “[s]tate enforcement actions having a connection with, or reference to carrier rates, routes, or services are pre-empted,” “such preemption may occur even if a state law’s effect on rates, routes or services is only indirect,” and “pre-emption occurs at least where state laws have a significant impact related to Congress’ deregulatory and pre-emption-related objectives” (Rowe at 370- *169 371 [citations and internal quotation marks omitted]). The Court also noted that “Morales said that federal law might not pre-empt state laws that affect fares in only a ‘tenuous, remote or peripheral . . . manner,’ such as state laws forbidding gambling,” but explained that the Morales Court “did not say where, or how, ‘it would be appropriate to draw the line,’ for the state law before it did not ‘present a borderline question’ ” (id. at 371, quoting Morales at 390).
In evaluating Maine’s efforts to regulate the delivery of tobacco in order to prevent minors from obtaining cigarettes, the United States Supreme Court held that federal law preempted the two statutory provisions at issue. The first provision required tobacco retailers to use a “delivery service” that provided a recipient-verification service (Rowe at 368). The Court concluded that this provision’s focus on “delivery service” created “a direct connection with motor carrier services” (id. at 371 [internal quotation marks omitted]). Moreover, the Court found that the provision had “a significant and adverse impact” on the FAAAA’s preemption objective because it would “require carriers to offer a system of services that the market does not now provide” and “would freeze into place services that carriers might prefer to discontinue in the future,” thereby impermissibly allowing Maine to “direct substitution of its own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide” (id. at 371-372 [internal quotation marks omitted]).
The second provision of the Maine statute forbade any person from “knowingly” transporting a tobacco product to anyone unless the sender or receiver had a Maine tobacco license (id. at 369 [internal quotation marks omitted]). It further provided that a person is “deemed to know” that a package contains tobacco when it is marked as originating from a Maine-licensed retailer or is sent by anyone identified as an unlicensed tobacco retailer on a list distributed by Maine’s Attorney General (id. [internal quotation marks omitted]). The Court determined that this provision applied even more directly to motor carrier services because, by imposing civil liability on carriers for the failure to sufficiently examine every package, carriers were required “to check each shipment for certain markings and to compare it against the Maine attorney general’s list of proscribed shippers, . . . thereby directly regulat[ing] a significant aspect of the motor carrier’s package pickup and delivery service” (id. at 372- *170 373). Furthermore, according to the Court, “[a]s with the recipient-verification provision, the ‘deemed to know’ provision would freeze in place and immunize from competition a service-related system that carriers do not (or in the future might not) wish to provide,” which “could easily lead to a patchwork of state service-determining laws, rules, and regulations” that “is inconsistent with Congress’ major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace” (id. at 373).
The Court rejected Maine’s argument that an implied exception from preemption should be recognized for state laws protecting the public health (see id. at 373-375). Although the Court noted that the FAAAA’s preemption provision did not apply generally to state public health regulation, the state law at issue “[was] not general, it [did] not affect truckers solely in their capacity as members of the general public, the impact [was] significant, and the connection with trucking [was] not tenuous, remote, or peripheral” (id. at 375). In the end, the Court concluded that, “from the perspective of pre-emption, this case is no more ‘borderline’ than was Morales” (id. at 376 [internal quotation marks omitted], quoting Morales at 390).
While the United States Supreme Court has expounded on the meaning of the phrase “related to” in Morales, Wolens, and Rowe, it has never explicitly interpreted the meaning of “service” as used in the ADA’s preemption provision. In this interpretive vacuum, the Federal Courts of Appeal have divided on the meaning of the term “service.” The Ninth and Third Circuits have adopted a narrow interpretation of that term. In Charas v Trans World Airlines, Inc. (160 F3d 1259, 1261 [1998]), the Ninth Circuit held that the term “service” refers to “the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail,” and did not include “an airline’s provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities” (accord Taj Mahal Travel, Inc. v Delta Airlines, Inc., 164 F3d 186, 193-195 [3d Cir 1998]).
In contrast, the courts of several other Circuits have defined the term “service” more broadly. In Hodges v Delta Airlines, Inc. (44 F3d 334, 336 [1995]), the Fifth Circuit concluded that the term “ ‘[services’ generally represents] a bargained-for or anticipated provision of labor from one party to another” and, in the airline context, “include[s] items such as ticketing, boarding procedures, provision of food and drink, and baggage *171 handling, in addition to the transportation itself.” The Seventh and Eleventh Circuits have adopted this definition (see Branche v Airtran Airways, Inc., 342 F3d 1248, 1256-1257 [2003], cert denied 540 US 1182 [2004]; Travel All Over the World, Inc. v Kingdom of Saudi Arabia, 73 F3d 1423, 1433 [1996]). In Smith v Comair, Inc. (134 F3d 254, 259 [1998]), the Fourth Circuit, citing Hodges, determined that “boarding procedures are a service rendered by an airline.”
In Air Transp. Assn, of Am., Inc. v Cuomo (520 F3d at 220), the Second Circuit considered a challenge, on ADA preemption grounds, to New York’s enforcement of its Passenger Bill of Rights (Executive Law § 553 [2] [b]-[d]; General Business Law §§ 251-f, 251-j [hereinafter the PBR]), enacted in the wake of “a series of well-publicized incidents during the winter of 2006-2007 in which airline passengers endured lengthy delays grounded on New York runways.” Among other things, the PBR required airlines to provide passengers boarded on aircraft and delayed more than three hours with “electric generation service to provide temporary power for fresh air and lights,” “waste removal service,” and “adequate food and drinking water and other refreshments” (id.). The Second Circuit expressly rejected the narrow interpretation of “service” adopted by the Ninth Circuit in Charas, finding that it was inconsistent with the Supreme Court’s decision in Rowe, where “the Court necessarily defined ‘service’ to extend beyond prices, schedules, origins, and destinations” (id. at 223). Without specifically endorsing a definition of “service,” the court had “little difficulty concluding that requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays relates to the service of an air carrier” (id. at 222). As such, the Second Circuit held that the PBR was preempted by the ADA, noting that it was “indistinguishable” from the Maine law the Supreme Court held preempted in Rowe in that “[i]t substitute^] New York’s commands for competitive market forces, requiring airlines to provide the services that New York specifies during lengthy ground delays and threatening the same ‘patchwork of state service-determining laws, rules, and regulations’ that concerned the court in Rowe” (id. at 223-224, quoting Rowe at 373). The Second Circuit also noted that Rowe foreclosed the argument that the PBR was shielded from preemption because it protected the public health and safety or involved “a matter of basic human necessities,” since “[o]nboard amenities, regardless of whether they are luxuries or necessities, still relate to *172 airline service and fall within the express terms of the preemption provision” (Air Transp. Assn, of Am., Inc. v Cuomo, 520 F3d at 224).
Despite the lack of consensus among federal courts as to the specific meaning of “service,” there is a general understanding that the ADA’s preemption provision does not preempt all state-law tort claims. The United States Supreme Court suggested as much in a footnote in Wolens. The Court cited the former FAA provision, currently codified at 49 USC § 41112 (a), that requires airlines to obtain insurance policies “for bodily injury to, or death of, an individual or for loss of, or damage to, property of others, resulting from the operation or maintenance of the aircraft,” and noted that the airline did not claim that “the ADA preempts personal injury claims relating to airline operations” (Wolens at 231 n 7).
Some courts have narrowly defined the term “service,” finding that state-law tort claims are not preempted (see Taj Mahal Travel, Inc. v Delta Airlines, Inc., 164 F3d at 194-195 [Third Circuit held that travel agency’s defamation claim against Delta based on letters advising passengers that tickets bought through the agency are considered stolen is “ ‘too tenuous, remote, or peripheral’ to be subject to preemption, even though Delta’s statements refer to ticketing, arguably a ‘service,’ ” because “(a)pplication of state law in these circumstances does not frustrate Congressional intent, nor does it impose a state utility-like regulation on the airlines”]; Charas v Trans World Airlines, Inc., 160 F3d at 1266 [Ninth Circuit stated that Congress “did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct,” and held that negligence claims based on such activities as “pushing of beverage carts, keeping the aisles clear of stumbling blocks, the safe handling and storage of luggage, assistance to passengers in need, or like functions” were not preempted]).
Even when federal courts apply a broader definition of “service,” some state-law tort claims have been allowed to proceed against airlines. In Hodges, the Fifth Circuit identified a distinction between common-law actions that related to services of an airline, which were therefore preempted, and “state tort actions for personal physical injuries or property damage caused by the operation and maintenance of aircraft,” which it held were not preempted, including a passenger’s negligence claim that she was injured by a case of rum that fell from an overhead bin (Hodges v Delta Airlines, Inc., 44 F3d at 336). The Fifth Circuit *173 relied, inter alia, on the statutory requirement that airlines obtain insurance coverage for personal injuries and property damage “resulting from the operation or maintenance of aircraft” and the fact that “neither the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even considered such preemption” (id. at 338).
In Travel All Over the World, Inc. v Kingdom of Saudi Arabia (73 F3d at 1433), the Seventh Circuit held that a travel agency’s claims alleging slander and defamation arising from an airline’s allegedly false statements were not preempted because the statements were not services within the meaning of the ADA, and the claims did not expressly refer to or have a significant effect on airline rates, routes, or services. The court also held that claims to recover damages for tortious interference with business opportunities, intentional infliction of emotional distress, and fraud were not preempted to the extent that they were based on the slanderous and defamatory statements, but were preempted to the extent that they were based on the airline’s cancellation of confirmed tickets (see id. at 1434-1435).
In Smith v Comair, Inc. (134 F3d 254 [1998]), the plaintiff boarded a flight to Cincinnati in Roanoke, Virginia, without being asked for proof of identification. Upon trying to make a connecting flight in Cincinnati, the airline refused to let the plaintiff board, providing a false reason for doing so, and causing the plaintiff to have to remain at the airport for several hours before the airline informed him that he was actually refused permission to board because airline representatives in Roanoke did not ask for identification (see id. at 256). Since the plaintiff had left his driver’s license in his car at the airport in Roanoke, the airline gave him a ticket back to Roanoke. While waiting to board, he directed an angry comment at an airline representative, who asked a security guard and a police officer to remove him. Upon being restrained, the plaintiff explained the situation to the police officer, who convinced the airline representative to let the plaintiff board the flight back to Roanoke. The plaintiff then commenced an action against the airline to recover damages for, inter alia, false imprisonment and intentional infliction of emotional distress (see id. at 256-257).
The Fourth Circuit held that the plaintiffs intentional tort claims were preempted to the extent that they were premised on the airline’s refusal to permit him to board the connecting *174 flight, because the claims involved an airline service relating to boarding procedures (see id. at 259). However, the claims alleging false imprisonment and intentional infliction of emotional distress were not preempted to the extent that they were based on conduct distinct from the airline’s conduct in refusing permission to board the flight.
“Suits stemming from outrageous conduct on the part of an airline toward a passenger will not be preempted under the ADA if the conduct too tenuously relates or is unnecessary to an airline’s services. If, for example, an airline held a passenger without a safety or security justification, a claim based on such actions would not relate to any legitimate service and would not be preempted” (id., citing Rombom v United Air Lines, Inc., 867 F Supp 214, 222, 224 [1994]).
The Fourth Circuit dismissed the plaintiff’s intentional tort claims for failure to state a claim to the extent that those claims were not preempted (see Smith v Comair, Inc., 134 F3d at 259-260).
The case of Rombom v United Air Lines, Inc. (867 F Supp 214 [1994]), cited by the Fourth Circuit in Smith, is the source of a three-part test articulated by then-District Judge (now Justice) Sotomayor that has been generally applied by district courts in the Second Circuit to determine whether a state-law claim relates to a “service” within the meaning of the ADA (see Farash v Continental Airlines, Inc., 574 F Supp 2d 356, 363 [2008], affd 337 Fed Appx 7 [2d Cir 2009]; In re Jetblue Airways Corp. Privacy Litig., 379 F Supp 2d 299, 315-316 [2005]). Under the Rombom test, a court must first determine “whether the activity at issue in the claim is an airline service” (Rombom v United Air Lines, Inc., 867 F Supp at 221). If it is not a service, “the preemption inquiry ceases, and the state law claims are actionable” (id. at 222). Second, “if the activity in question implicates a service, the court must then determine whether the claim affects the airline service directly or tenuously, remotely, or peripherally” (id.). If the “specific state tort claim has only an incidental effect on a service, there is no preemption” (id.). Third, if “the activity in question directly implicates a service,” the court must determine “whether the underlying tortious conduct was reasonably necessary to the provision of the service” (id.). Where the activity represents “outrageous conduct that goes beyond the scope of normal aircraft operations,” the *175 claims should not be preempted (id.). For example, if a flight attendant deals with a boisterous passenger by shooting the passenger, the state-law tort claim would not be preempted; if, however, the flight attendant acted in a rude or unprofessional manner in telling the passenger to be quiet, the state-law tort claim would be preempted (see id. at 222-223).
C. The Plaintiffs Claims
Applying the Rombom test to the facts of this case, we first find that the provision of food, water, clean air, and toilet facilities, as well as the ability to deplane after a prolonged period on the tarmac, all relate to and implicate an airline service. Second, the claims under review in this action directly address the provision of those services. Finally, the alleged “underlying tortious conduct was reasonably necessary to the provision of the service” (id. at 222).
As the cases demonstrate, analysis of the preemptive effect of the ADA on state-law tort claims requires a case-by-case examination of the underlying actions giving rise to the claims to determine whether they relate to airline prices, routes, or services (see Travel All Over the World, Inc. v Kingdom of Saudi Arabia, 73 F3d at 1433). This is no less true in the evaluation of false imprisonment claims asserted against airlines (see Smith v Comair, Inc., 134 F3d 254 [1998]). In Chrissafis v Continental Airlines, Inc. (940 F Supp 1292, 1298 [1996]), the District Court noted that there were “divergent conclusions” amongst courts addressing whether the ADA preempted false imprisonment and false arrest claims. The District Court reconciled those cases based on two general, distinguishable fact patterns:
“Those cases concluding that the ADA preempts false arrest and false imprisonment claims involve incidents in which the airline refused or failed to provide a service to a passenger . . .
“In contrast, where the gist of the false arrest and false imprisonment claim is that the airline caused the passenger to be arrested by authorities without a proper factual basis, courts have held that the claims are not related to services and, therefore, are not preempted” (id. at 1298; see Al-Watan v American Airlines, Inc., 570 F Supp 2d 925, 936-939 [2008] [concluding that false imprisonment and false arrest claims fell into the latter category and were not preempted where the plaintiffs alleged that they *176 were impermissibly discriminated against when they were improperly detained as a security risk and questioned in front of other passengers]; Williams v Express Airlines I, Inc., 825 F Supp 831, 833 [1993] [holding that a false imprisonment claim based on an airline’s conduct in stopping the plaintiff, who was in a wheelchair, from boarding a flight and then confining him in an aisle chair was preempted because the plaintiffs objectives, to fly on the plane and receive mobility assistance in the gate area, were related to an airline service]).
Here, the plaintiffs false imprisonment cause of action, based on JetBlue’s confinement of her on a plane for several hours against her will, falls into the first category identified in Chrissafis (see Joseph v JetBlue Airways Corp., 2012 WL 1204070, *7, 2012 US Dist LEXIS 50974, *21 [ND NY, Apr. 11, 2012, No. 5:11-CV-1387 (TJM/ATB)] [“The alleged (false imprisonment) directly affected, and was reasonably necessary to, the service of maintaining safety by controlling passengers’ movement while the airplanes were grounded on the tarmac due to adverse weather conditions”]). To the extent that other courts, as cited by the plaintiff, have addressed false imprisonment claims based on similar airline conduct in confining passengers for lengthy delays on grounded airplanes and have determined that the claims were not preempted by the ADA, we decline to follow these cases, inasmuch as they rely upon a definition of the word “service” which is too narrow, and contrary to the Second Circuit’s holding in Air Transp. Assn, of Am., Inc. v Cuomo (520 F3d at 219), which applied the principles enunciated by the United States Supreme Court in Rowe (552 US 364 [2008]). The conduct complained of here is not distinct from any anticipated provision of labor and is not “too tenuously relate [d] or . . . unnecessary to an airline’s services” (Smith v Comair, Inc., 134 F3d at 259).
Accordingly, we conclude that the false imprisonment cause of action is preempted by the ADA (see Joseph v JetBlue Airways Corp., 2012 WL 1204070, *7, 2012 US Dist LEXIS 50974, *21 [2012]).
With respect to the plaintiffs negligence cause of action, the Supreme Court determined that it was preempted “insofar as it seeks damages other than for physical injury.” To the extent the Supreme Court determined that the ADA preemption provision did not apply to negligence claims alleging *177 personal injury, it was correct (see Hodges v Delta Airlines, Inc., 44 F3d at 336). We note that, on this appeal, there was no distinction drawn between physical and emotional injuries the plaintiff claimed to have sustained. Accordingly, we decline to address such a distinction here.
The intentional infliction of emotional distress cause of action is likewise preempted since it is based on JetBlue’s conduct related to supplying “adequate water, food, restroom facilities and breathable air at proper temperatures,” and “basic survival necessaries,” as alleged by the plaintiff. This conduct expressly relates to airline “services,” as that term is construed by a majority of the federal circuits (see Air Transp. Assn, of Am., Inc. v Cuomo, 520 F3d at 223; Travel All Over the World, Inc. v Kingdom of Saudi Arabia, 73 F3d at 1434; Hodges v Delta Airlines, Inc., 44 F3d at 336).
The plaintiffs fraud and deceit cause of action is preempted by the ADA as well. That cause of action is based on alleged misrepresentations made by JetBlue personnel “that the aircraft would take off or return to the terminal gate shortly.” The subject statements by airline personnel were directly related to the provision of an airline service. Since the plaintiffs fraud and deceit cause of action does not allege behavior that is outrageous and beyond the scope of normal airline operations, it is preempted.
II. Renewal or Reargument of the Plaintiffs Motion for Class Certification
Initially, the appeal from so much of the order dated January 27, 2011, as denied that branch of the plaintiffs motion which was for leave to reargue her motion for class certification must be dismissed, as no appeal lies from an order denying reargument.
There is no dispute that the plaintiff did not submit complete copies of her initial supporting papers when she moved, inter alia, for leave to renew her motion for class certification after issue was joined. Instead, in her moving papers, the plaintiff made reference to electronic docket entry numbers referencing the previously e-filed documents on which she relied.
The plaintiff argues that she was not required by any court rule to submit supporting documents in paper form or electronically, and, as the practice in federal court permits, she should simply be able to refer to the electronic docket entry number *178 and deem the documents “furnished to the court” pursuant to CPLR 2214. Further, she asserts that the cases relied upon by the Supreme Court involve pre-electronic-filing cases and are inapplicable to cases using the e-filing system. She urges this Court to review her motion for class certification de novo and grant the motion.
In opposition, JetBlue contends that the Supreme Court properly denied that branch of the motion which was for leave to renew because the plaintiff was required by CPLR 2214 to submit a copy of the supporting papers regardless of the fact that the documents had previously been submitted electronically in connection with the initial motion.
CPLR 2214 (c) provides, in pertinent part:
“Each party shall furnish to the court all papers served by him. The moving party shall furnish at the hearing all other papers not already in the possession of the court necessary to the consideration of the questions involved . . . Only papers served in accordance with the provisions of this rule shall be read in support of, or in opposition to, the motion, unless the court for good cause shall otherwise direct.”
Where parties in civil actions commenced in the Supreme Court and the County Court consent to e-file, “all documents required to be filed with the court by a party . . . shall be filed and served electronically” (22 NYCRR 202.5-b [d] [1] [i]). When a document has been filed electronically, “the official record shall be the electronic recording of the document stored by the clerk” (22 NYCRR 202.5-b [d] [4]). “The court may require the parties to provide working copies of documents filed electronically” (id.; see 22 NYCRR 202.5-b [a] [2] [vi], [vii]).
“There is no authority for compelling [a court] to consider papers which were not submitted in connection with the motion on which it is ruling; indeed, under CPLR 2214 (c), the court may refuse to consider improperly submitted papers” (Loeb v Tanenbaum, 124 AD2d 941, 942 [1986]; see Wells Fargo Home Mtge., Inc. v Mercer, 35 AD3d 728 [2006]; Sheedy v Pataki, 236 AD2d 92, 97-98 [1997]).
Some trial courts, in deciding motions for leave to renew and/or reargue, have concluded that the moving party’s failure to submit the papers relied upon in connection with the initial motion renders the motion for leave to renew and/or reargue defective (see e.g. Stardial Communications Corp. v City of New *179 York, 2011 NY Slip Op 32520[U],*4 [Sup Ct, NY County 2011]; All Am. Moving & Stor., Inc. v Andrews, 31 Misc 3d 1214[A], 2011 NY Slip Op 50668[U], *3 [Sup Ct, Bronx County 2011]; Cohen v Romanoff, 27 Misc 3d 1208[A], 2010 NY Slip Op 50627[U], *6 [Sup Ct, Kings County 2010]; J.D.M. Import Co., Inc. v Hartstein, 2008 NY Slip Op 30668[U] [Sup Ct, NY County 2008]; Lower Main St., LLC v Thomas Re & Partners, NYLJ, Apr. 5, 2005 at 19, col 3, [Sup Ct, Nassau County 2005]; see also Brzozowy v ELRAC, Inc., 11 Misc 3d 1055[A], 2006 NY Slip Op 50220[U], *2 [Sup Ct, Kings County 2006], mod 39 AD3d 451 [2007]).
Contrary to the plaintiffs contention, in moving for renewal, both CPLR 2214 and the court rules governing e-filing required her to submit electronically the papers originally submitted with her motion for class certification. Unlike the practice in certain federal district courts, relied upon by the plaintiff, no provision in 22 NYCRR 202.5-b permits a party to refer to supporting documents by the e-filed docket entry number rather than filing the documents themselves. Indeed, 22 NYCRR 202.5-b (d) (1) (i) provides that “all documents required to be filed with the court by a party . . . shall be filed and served electronically” (emphasis added). Thus, the plaintiffs initial motion for class certification and its accompanying exhibits and the responding papers should have been electronically filed with the court as an exhibit to the plaintiffs motion, inter alia, for leave to renew.
While the above-cited decisions, holding that motions for leave to renew and/or reargue were defective because the movant failed to submit a proper record, did not involve e-filed cases, the rationale for those decisions nevertheless applies to the case at bar notwithstanding the greater efficacy of the e-filing system. If a party simply refers to docket entry numbers, the motion court would still be forced to expend time locating those documents in the system, a task that could easily be complicated by a voluminous record or incorrect citations to docket entry numbers. Consequently, just as a court “should not be compelled to retrieve the clerk’s file in connection with its consideration of subsequent motions” (Sheedy v Pataki, 236 AD2d at 97; see Loeb v Tanenbaum, 124 AD2d at 942), a court should likewise not be compelled, absent a rule providing otherwise, to locate previously submitted documents in the electronic record in considering subsequent motions.
Here, the plaintiff only submitted an attorney’s affirmation referring to the docket entry numbers of previously submitted *180 documents and a memorandum of law in support of her motion for leave to renew or reargue, and failed to submit any of the documents necessary for the determination of the subject motion (see Wells Fargo Home Mtge., Inc. v Mercer, 35 AD3d 728 [2006]). Whether to grant leave to renew or reargue is within the sound discretion of the motion court (see HSBC Bank USA, N.A. v Halls, 98 AD3d 718, 720 [2012]; Matheus v Weiss, 20 AD3d 454, 454-455 [2005]). The Supreme Court providently exercised its discretion in denying that branch of the plaintiffs motion which was for leave to renew on the basis that the plaintiffs supporting papers were insufficient.
Accordingly, the order entered October 12, 2010, is affirmed insofar as appealed from, the appeal from so much of the order dated January 27, 2011, as denied that branch of the plaintiffs motion which was for leave to reargue is dismissed, as no appeal lies from an order denying reargument, and the order dated January 27, 2011, is affirmed insofar as reviewed.
Dillon, J.P., Florio and Roman, JJ., concur.
Ordered that the order entered October 12, 2010, is affirmed insofar as appealed from; and it is further,
Ordered that the appeal from so much of the order dated January 27, 2011, as denied that branch of the plaintiffs motion which was for leave to reargue is dismissed, as no appeal lies from an order denying reargument; and it is further,
Ordered that the order dated January 27, 2011, is affirmed insofar as reviewed; and it is further,
Ordered that one bill of costs is awarded to the defendant Jet-Blue Airways Corporation.

. On April 29, 2010, the parties entered into a stipulation consenting to use the New York State Courts Electronic Filing System in this case.

. In reenacting title 49 of the US Code in 1994 (Pub L 103-272, 108 US Stat 745), Congress made stylistic, nonsubstantive revisions to the provision, previously codified at 49 USC Appendix § 1305 (a) (1) (see American Airlines, Inc. v Wolens, 513 US 219, 223 n 1 [1995]).